IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MARCH 1999 SESSION

FILED

July 8, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9804-CR-00111 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable Joseph B. Dailey, Judge |
| | ) | |
| RODNEY D. PALMER, | ) | (Attempted second degree murder and |
| | ) | three counts of aggravated assault) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

A. C. Wharton, Jr.
District Public Defender
      and
Dianne Thackery
Assistant Public Defender General
201 Poplar Avenue, Ste. 201

Memphis, TN 38103-1947
(AT TRIAL)

A. C. Wharton, Jr.
District Public Defender
      and
W. Mark Ward
Assistant Public Defender Floor
201 Poplar Avenue, Ste. 201
Memphis, TN 38103-1947
(ON APPEAL)

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
and
Douglas D. Himes
      Assistant Attorney

425 Fifth Avenue North

Nashville, TN 37243-0493

William L. Gibbons
   District Attorney General
         and
Jerry Harris
Assistant District Attorney General
      201 Poplar Avenue, 3rd

Memphis, TN 38103

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge


**O P I N I O N**


The defendant, Rodney D. Palmer, was convicted by a jury in the Shelby County Criminal Court of attempted second degree murder, a Class B felony, and three counts of aggravated assault, a Class C felony. He was sentenced to ten years in the Department of Correction as a Range I, standard offender for the attempted second degree murder conviction and to eight years as a Range II, multiple offender for each aggravated assault conviction. The ten year sentence and two of the eight year sentences are consecutive to each other, and the remaining eight year sentence is concurrent for an effective twenty-six year sentence. In this appeal as of right, the defendant contends that:

> (1) attempted second degree murder is not a crime;
>
> (2) the trial court gave an erroneous instruction on attempted second degree murder; and
>
> (3) the trial court erred in imposing consecutive sentences because the defendant is not a dangerous offender and does not have an extensive criminal record within the meaning of the statute and because the trial court failed to consider the criteria set forth in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995).

We affirm the judgments of conviction.

2

Belinda Palmer, the defendant's wife, testified that in February 1997, she lived with the defendant, her two sisters, Tameka and Tracy Parsons, and her cousin, John Gross. She said that she was in the hospital for two weeks in October 1996 following gastro-bypass surgery and that she returned to the hospital for seven days in January 1997. She said that on Friday, February 14, 1997, she had not yet returned to work after getting out of the hospital. She said that she believed that the defendant smoked crack cocaine purchased with his income tax refund over that weekend from Valentine's Day until she saw him on Monday night or early Tuesday morning.

Mrs. Palmer testified that at 8:00 a.m. on Tuesday, February 18, the defendant asked her to take him to work, but she refused and told him to leave. She said that she was in the bathroom when the defendant stabbed her in the chest, back, and arm. She said that either just before or as he was stabbing her, the defendant said, "B**ch, I'm going to put you in the Med." She said that after he stabbed her, she lay on the bathroom floor in shock and yelling. She said that she has scars from all three wounds and that she has nightmares about the incident.

Tameka Parsons testified that she lived with her sister, Mrs. Palmer, and the defendant in February 1997. She said that the defendant left the house Friday night, February 14, and returned early Tuesday morning around 2:00 a.m. She said that between 8:00 and 8:30 a.m., she heard Mrs. Palmer and the defendant arguing in the master bedroom. She said that Mrs.

3

Palmer had been on the telephone that morning with her father telling him that she was tired of the defendant spending his money on drugs and that she wanted him out of her house.

Tameka Parsons testified that she then heard Mrs. Palmer yelling and that she thought that Mrs. Palmer and the defendant were fighting, but she did not know that he was stabbing her. She said that she and her sister, Tracy Parsons, kicked open the bedroom door and that the defendant came out of the bedroom and stabbed them. She said that he first stabbed her on her arm and under her arm, using a large kitchen knife. She said that she and her sister did not fight with the defendant or say anything to him before he stabbed them. She said that her sister pulled her from the hall into her room, and they closed the door. She said that she kicked the door open in order to help Mrs. Palmer.

John Gross testified that in February 1997, he lived on Janssen Street with Mrs. Palmer. He said that at that time, Mrs. Palmer was sick and was having complications from surgery. He said that on the morning of February 18, Mrs. Palmer called her father and told him that the defendant had not been there over the previous weekend, that she was tired of it and did not want to live like that anymore, and that she wanted to get a divorce. He said that Mrs. Palmer asked the defendant to leave, and the defendant responded that he was not going anywhere. He said that the defendant and Mrs. Palmer began to argue heatedly in the living room, and they moved to the master bedroom at the

4

defendant's request. He said that the defendant locked the bedroom door.

Mr. Gross testified that he could hear Mrs. Palmer yelling. He said that he was standing behind Mrs. Palmer's sisters when they kicked the bedroom door open. He said the defendant came toward the sisters with a large chef's knife and began stabbing them. He said the knife was six inches long and about two inches wide. He said that the sisters did not say anything to the defendant before the stabbing nor did they have anything in their hands.

Mr. Gross testified that he turned and ran outside onto the porch intending to get help. He said that the defendant ran after him and stabbed him once in the right shoulder. He said that he had not said anything to the defendant before the defendant stabbed him and that he was on the cordless telephone trying to get help. He said the defendant then entered the house, grabbed Mrs. Palmer's purse and car keys, and drove away in her car. He said that he did not know if the defendant took the knife with him when he left. He said that he lost a lot of blood from the stab wound and that he was treated and released from the hospital.

Tracy Parsons testified that on the morning of February 18, 1997, she was at Mrs. Palmer's house. She said that the defendant and Mrs. Palmer first argued in the living room. She said that they were loud but that she was not paying attention to

what they were arguing about. She said they went into the bedroom and Mrs. Palmer started yelling. She said that she and her sister, Tameka Parsons, kicked the door open and that she could see Mrs. Palmer gasping for breath on the floor of the bathroom connected to the master bedroom. She said that within a few seconds, the defendant stabbed her and her sister. She said that she was stabbed in the chest and in the upper back. She said that she did not have anything in her hands and did not say anything to the defendant before he stabbed her.

Tracy Parsons testified that she is four feet, eleven inches tall and that she weighs one hundred fifteen pounds. She said that she was in the hospital for three days after the defendant stabbed her. She said that her lungs collapsed and that a chest tube was inserted through her side.

On cross-examination, Tracy Parsons testified that when they kicked the bedroom door open, Tameka was closer to the defendant. She said that the defendant came out of the bedroom as soon as the door opened. She said that the hallway was wide enough for the defendant to pass through even though she and Tameka were standing there and that she was only partially blocking the doorway. She said that the defendant stabbed her first in the chest, then he stabbed her back as she was turning away from him. She said that the defendant then went down the hall and into the living room. She said that she and Tameka went into Tameka's bedroom and closed the door. She said she saw the defendant come out the front door, go back in the house, and come

out again with keys. She said that she did not see or hear him attack anyone after he went back in the house.

Officer Russell Stevens of the Memphis Police Department testified that he was on duty the morning of February 18, 1997, and that he received a call to go to 4452 Janssen. He said that when he arrived, two ambulances were already on the scene, and attendants were taking two females from the house. He said that he saw a bleeding male outside, and a paramedic advised him that three people were critically injured.

Officer Stevens said that he went inside and saw Mrs. Palmer lying in the middle of the living room floor on her side. He said that he could see that she was bleeding from her upper body but that a pillow drenched with blood blocked his view of the wound. He said that Mrs. Palmer was talking on the telephone, trying to get someone to take care of her children and that she was hysterical. He said that Mrs. Palmer told him that she had been fighting with the defendant in the master bedroom and that the fight had escalated. He said that she told him that the defendant said, "You're a smart b**ch. I'm going to send you to the Med" and then he stabbed her.

Officer Stevens said that in the master bedroom, he found a dayplanner on the bed. In the dayplanner, he found the defendant's identification and a glass cylinder used to smoke crack. He said that the door to the bedroom appeared to have been kicked or forcibly pushed open.

7

The defendant testified that in 1991 he received a one-year sentence for reckless endangerment and a two-year sentence for theft. He said that on February 18, 1997, he lived at 4452 Janssen with his wife, her two sisters, and her cousin. He said that at that time, he had been working at Jolly Royal Furniture for eight months. He said that on Friday, February 14, he went home after work, stayed at his house for three to four hours, and then went to his mother's house. He said that he left because his wife's sisters and cousin and some other people were preparing to have a party funded by their income tax refunds. He said that he had received his paycheck that day, not an income tax refund. He said that Mrs. Palmer had returned to work two weeks earlier and that she had just gotten home from work when he left. The defendant stated that he smoked crack that weekend.

The defendant testified that Mrs. Palmer picked him up at his mother's house at about 12:35 p.m. or close to 1:00 a.m. on Tuesday. He said that he awoke at 6:30 or 7:00 a.m. and prepared for work. He said he asked Mrs. Palmer to take him to work, and they began to argue because she refused to take him to work and told him that she wanted him out of the house. He said that they argued for about twenty minutes starting in the living room and then continuing in their bedroom where he locked the door. He said that when he realized that they could not come to an understanding, he went to get the car keys from Mrs. Palmer's purse, which was hanging on the back of the bedroom door. He stated that Mrs. Palmer grabbed him around the waist to try to stop him from leaving in the car. He said that he and Mrs.

8

Palmer then got into a physical fight and that when her sisters and cousin heard them bumping into things, they kicked open the bedroom door.

The defendant testified that when Mrs. Palmer's sisters and cousin started toward him, he grabbed a steak knife from the dresser or from a chair in the bedroom. He said that he had not put the knife there. He said that Mrs. Palmer was still holding him around the waist with her shoulder in his stomach pushing him backward into the bed. He said that as the others rushed into the room, he stabbed Mrs. Palmer in the back. He said that Tameka and Tracy got on him and he stabbed them.

The defendant testified that he then ran to the back door in the kitchen. He said that Mr. Gross was running in front of him and that he went to the back door to avoid Mr. Gross, who went to the front door. He said that the back door was locked and that he went back to the bedroom to get the keys to the door and the car. He said that Tameka and Tracy were no longer in the bedroom. He said that he got the keys, asked Mrs. Palmer if she was alright, and ran to the front door. He said that Mr. Gross was blocking the front door and he stabbed Mr. Gross. He said he then left in his and Mrs. Palmer's car. He said he tried to use the cellular phone to call 9-1-1 but that 9-1-1 was not accessible in that area. He said he then called Mrs. Palmer's father and asked him to come to the house and check on everyone. He said that three or four days later he turned himself in to the police.

9

On cross-examination, the defendant testified that Mrs. Palmer's three- year-old daughter and Tameka's baby were also in the house at the time of the incident. He admitted that on that morning, he and Mrs. Palmer argued in part over his drug use. He said that he did not have the knife until all four people came in the bedroom and that as he was stabbing them, they were still attacking him. He said that at the time Tracy attacked him, he had not yet stabbed Tameka. He admitted that he stabbed Mr. Gross in the back. He said it was necessary to stab the victims because he thought that he was being attacked. He said that he did not know if anyone had anything in their hands when they attacked him. He said that he did not have to go the hospital after the incident and that he was treated by his mother. He said that he was five feet, eleven inches tall and weighed one hundred seventy pounds.

Based on the foregoing evidence, the jury convicted the defendant of attempted second degree murder for the attack on Mrs. Palmer and aggravated assault for the stabbing of Tameka and Tracy Parsons and Mr. Gross.

## I. ATTEMPTED SECOND DEGREE MURDER

The defendant contends that attempted second degree murder does not constitute an offense in Tennessee because the requirement of specific intent in the attempt statute cannot be combined with the lesser <u>mens</u> <u>rea</u> of "knowing" required for second degree murder. The defendant argues that this case is analogous to <u>State v. Kimbrough</u>, 924 S.W.2d 888 (Tenn. 1996), in

which the Tennessee Supreme Court held that the attempt statute could not be combined with the felony murder statute because one could not intend to commit a reckless act. The state contends that the analysis in <u>Kimbrough</u> does not apply because one can intend to act knowingly. We agree.

Initially, the state asserts that although the defendant objected to the charging of the offense of second degree murder during the trial, the defendant has abandoned this issue by failing to raise it in his motion for a new trial. <u>See</u> T.R.A.P. 3(e). However, we may properly review its merits because deciding this issue in the defendant's favor would lead to dismissal of the charges rather than to a new trial.

In <u>Kimbrough</u>, our supreme court held that the specific intent required by the criminal attempt statute[1] was inconsistent with felony murder because attempt requires a specific intent,

---

[1]Tenn. Code Ann. § 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

11

and one cannot intend to commit an unintentional act.  924 S.W.2d at 890.  "Second degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210.  With regard to attempted second degree murder, this court has noted that unlike a <u>mens</u> <u>rea</u> of recklessness, the mental states of intentional or knowing both "involve a level of conscious awareness and volitional, affirmative conduct."  <u>State v. Dale Nolan</u>, No. 01C01-9511-CC-00387, Sequatchie County, slip op. at 18 n.9 (Tenn. Crim. App. June 26, 1997), <u>app.</u> <u>denied</u> (Tenn. Mar. 2, 1998) (declining to recognize the offense of attempted criminally negligent homicide).

This court has continuously recognized the offense of attempted second degree murder.  <u>See</u> <u>State v. Craig Bryant</u>, No. 02C01-9707-CR-00286, Shelby County, slip op. at 13 (Tenn. Crim. App. Jan. 8, 1999), <u>applic.</u> <u>filed</u> (Tenn. Mar. 9, 1999); <u>e.g.</u>, <u>State v. Eldridge</u>, 951 S.W.2d 775, 779 (Tenn. Crim. App. 1997) (upholding jury charge on attempted second degree murder); <u>Grant C. Ivey v. State</u>, No. 01C01-9801-CC-00052, Rutherford County, slip op. at 4 (Tenn. Crim. App. Apr. 20, 1999) (holding that retrial for attempted second degree murder did not violate double jeopardy); <u>State v. Jose Holmes</u>, No. 02C01-9505-CR-00154, Shelby County, slip op. at 3-4 (Tenn. Crim. App. Dec. 10, 1997), <u>app.</u> <u>denied</u> (Tenn. Sept. 21, 1998) (reversing attempted felony murder conviction under <u>Kimbrough</u> and remanding for retrial on attempted second degree murder); <u>State v. Frederick R. Porter</u>, No. 03C01-9606-CC-00238, Anderson County, slip op. at 5 (Tenn. Crim. App. Oct. 24, 1997), <u>applic.</u> <u>filed</u> (Tenn. Apr. 2, 1998) (holding that

12

the evidence was sufficient to support the attempted second degree murder conviction).  In Kimbrough, the supreme court indicated that the concerns raised by combining the attempt statute with felony murder were not implicated by attempted murder:

> Of course, it goes without saying that if an accused actually possesses the requisite intent to kill, he or she may be charged with attempted murder.  We simply believe that it is logically and legally impossible to attempt to perpetrate an unintentional killing.

924 S.W.2d at 892.  We hold that the intent to commit a knowing act is neither logically nor legally impossible.  Thus, an attempt to commit second degree murder is a criminal offense in Tennessee.

## II. JURY INSTRUCTIONS

The defendant contends that the trial court's failure to instruct the jury that the defendant must have "intended" the killing was a fundamental or plain error.  See State v. Stephenson, 878 S.W.2d 530, 553-54 (Tenn. 1994) ("a trial court judge's failure to give a jury charge on matters characterized as 'fundamental' may be found to be error requiring reversal despite the fact that the defendant did not request the omitted instructions"); Tenn. R. Crim. P. 52(b).  The defendant also argues that the trial court erroneously instructed the jury that in order to find the defendant guilty of attempted second degree murder, the defendant must have committed a "knowing" homicide. The state responds that the trial court correctly instructed the jury on attempted second degree murder.  We agree.

13

The state initially argues that the defendant has waived this issue for failing to include it in his motion for new trial. Because we believe that a jury instruction which did not accurately charge the requisite mental state would substantially affect the defendant's rights, we will address the merits of this issue in order to do substantial justice. See Tenn. R. Crim. P. 52(b).

Kimbrough holds that an attempt to commit murder entails a specific intent to kill. 924 S.W.2d at 891. In Eldridge, this court approved the fourth edition of the pattern jury instruction because this instruction "expressly includes the defendant's intent to commit the specific offense as an essential element." 951 S.W.2d at 779 (noting that this instruction had not been published at the time of trial); see T.P.I.--Crim. 4.01 (4th ed. 1995). In the present case, the trial court used the fourth edition of the pattern instruction on attempt, charging as follows:

> For you to find a person guilty of criminal attempt, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> that the defendant intended to commit the specific offense of Murder in the Second Degree; and
>
> that the defendant did some act or caused something to happen that would have constituted Murder in the Second Degree if the defendant's beliefs at the time he acted had in fact been true; or
>
> that the defendant did some act intending to cause an essential element of Murder in the Second Degree to occur, and at the time believed the act would cause the element to

14

occur without further action on the defendant's part; or

that the defendant did some act intending to complete a course of action or cause a result that would constitute Murder in the Second Degree under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of Murder in the Second Degree. The defendant's actions do not constitute a substantial step unless the defendant's entire course of action clearly shows his intent to commit Murder in the Second Degree.

(emphasis added). Because the trial court specifically charged that the jury must find that the defendant intended to commit second degree murder, we hold that the instruction was proper. The trial court's further instruction that second degree murder requires that the defendant act knowingly does not detract from the accuracy of this instruction.

### III. CONSECUTIVE SENTENCES

The defendant contends that the trial court erred in imposing consecutive sentences because he is not a dangerous offender, he does not have an extensive criminal record within the meaning of the statute, and the trial court failed to consider the criteria set forth in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). The state contends that consecutive sentences were proper. We agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), -402(d). As the Sentencing Commission Comments to these sections note, the burden

15

is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances". State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any

16

mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B, C, D or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. Tenn. Code Ann. § 40-35-210(c).  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors.  Tenn. Code Ann. § 40-35-210(d), (e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; See Ashby, 823 S.W.2d at 169.

At the sentencing hearing, the defendant testified that he had apologized by telephone to all of the victims and that he understood that what he did was wrong although at the time, he thought that the victims were trying to hurt him.  He said that he cared deeply for all of the victims.  On cross-examination, he said that the stabbings were a mistake, that he took full responsibility for what happened that day, and that the incident arose out of passion.

17

The presentence report reveals that the then thirty-one-year-old defendant graduated from high school and worked in shipping and receiving at Jolly Royal from August 1996 through February 1997. Prior to this, he had worked eight months for Kroger as an overnight stocker, and in 1987, he had worked three and one-half months at El Chico as a dishwasher. In the presentence report, the defendant admitted that he began using drugs in 1987 following deaths in his family and that he used the drugs to cope with his grief. The presentence report reflects a substantial prior criminal history, including convictions in 1995 for evading arrest; in 1991 for reckless endangerment not involving a weapon, theft of property valued at five hundred to one thousand dollars, aggravated assault, and simple assault; and in 1989 for three weapons offenses. On January 10, 1990, the defendant violated two conditions of the probation stemming from his weapons offenses. Additionally, the defendant was convicted of four driving- related offenses between October 1990 and May 1997.

The trial court enhanced the defendant's sentence, finding that with regard to enhancement factor (1), Tenn. Code Ann. § 40-35-114, the presentence report revealed a history of prior criminal convictions in addition to those necessary to establish the range. Under factor (4), the trial court found that Mrs. Palmer was particularly vulnerable because she was still weak from surgery and not in a position to respond to the assault by the defendant. Regarding factor (6), the trial court determined that Mrs. Palmer and her two sisters received

18

particularly great personal injuries.  The trial court found that factor (9) applied because the defendant used a deadly weapon, a knife.  With regard to factor (10), the trial court found that having no hesitation to commit a crime when the risk to human life is high is part of the offense of attempted second degree murder but that it would apply to all three aggravated assaults.

The trial court found that mitigating factor (13), Tenn. Code Ann. § 40-35-113, applied because the defendant graduated from high school and had some employment history, but it gave this factor very little weight in light of its finding that the defendant had been in and out of trouble for his entire adult life.  Reflecting upon the numerous enhancement factors with virtually no mitigation, the trial court sentenced the defendant to ten years for the attempted second degree murder and to eight years for each of the three aggravated assaults.

The trial court found consecutive sentences to be appropriate because the defendant had an extensive record of criminal activity, which included violent offenses, and because the defendant was a dangerous offender.  See Tenn. Code Ann. § 40-35-115(b)(2), (4).  The trial court ordered the eight-year sentences for the aggravated assaults of Tameka and Tracy Parsons to be concurrent because the court viewed the assault upon them to be a single event occurring as the defendant left his bedroom after stabbing Mrs. Palmer.  It found the stabbing of Mrs. Palmer and of Mr. Gross to be separate events, and it noted that the defendant could have left the house without stabbing  Mr. Gross.

The trial court ordered the ten-year sentence for the attempted second degree murder to run consecutively to the concurrent eight-year sentences for the aggravated assaults of the sisters and consecutively to the eight-year sentence for the aggravated assault of Mr. Gross.

## A. EXTENSIVE CRIMINAL HISTORY

The defendant contends that he does not have an extensive criminal record within the meaning of Tenn. Code Ann. § 40-35-115(b)(2) because this category applies when a defendant's present offenses for which sentences are being imposed are extensive and continuing rather than when a defendant has an extensive prior criminal record.  He then argues that because his convictions in this case arise out of a single incident, the trial court erred in imposing consecutive sentences under this category.  The state contends that the great weight of authority supports the trial court's interpretation of this factor, and it was properly applied to the defendant.  We agree.

Consecutive sentencing is guided by Tenn. Code Ann. § 40-35-115(b), which states in pertinent part:

The court may order sentences to run consecutively if the court
finds by a preponderance of the evidence that:

. . . .

(2) The defendant is an offender whose record of criminal activity is extensive[.]

Rule 32(c)(1), Tenn. R. Crim. P., requires that the trial court "specifically recite the reasons" behind its imposition of a

20

consecutive sentence. In this case, the trial court referred to the defendant's prior criminal record, which includes eight convictions in addition to two probation violations and several driving offenses.

The Sentencing Commission Comments to Tenn. Code Ann. § 40-35-115 note that the first four categories in subsection (b)(2) were taken from Gray v. State, 538 S.W.2d 391 (Tenn. 1976). The defendant contends that the wording of subsection 115(b)(2) comes from the supreme court's definition of a "multiple offender" in Gray. See Id. at 393. A fifth category set forth in Gray, "the persistent offender," was based upon a defendant's prior criminal record. Id. The supreme court distinguished between these two categories as follows:

> The prior record of the persistent offender
> will indicate that he is one not likely to be
> rehabilitated and should be incarcerated under
> consecutive sentences for the protection of
> the public. . . . The prior record of the
> multiple offender may have been good, but the
> crimes for which he has been convicted
> indicate criminal activity so extensive and
> continuing for such a period of time as to
> warrant consecutive sentencing.

Id. The legislature did not incorporate the "persistent offender" category into Tenn. Code Ann. § 40-35-115(b)(2). The Sentencing Commission Comments to § 40-35-115 explain that the legislature incorporated the "persistent offender" category into the various sentencing ranges, which provide a greater potential sentence based upon a defendant's prior felony convictions. We acknowledge that Gray and the Comments, considered together, can lead one to interpret the statute as the defendant suggests.

However, the great majority of the Tennessee cases applying subsection 115(b)(2) have interpreted subsection 115(b)(2) more broadly.

Since the 1989 Sentencing Act became effective, all reported and most unreported cases of this court have consistently interpreted § 40-35-115(b)(2) to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court. See, e.g., State v. Baker, 956 S.W.2d 8, 18 (Tenn. Crim. App. 1997); State v. Ensley, 956 S.W.2d 502, 514 (Tenn. Crim. App. 1996); Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996); State v. Nix, 922 S.W.2d 894, 904 (Tenn. Crim. App. 1995); State v. Tuttle, 914 S.W.2d 926, 933 (Tenn. Crim. App. 1995); State v. Marshall, 888 S.W.2d 786, 787 (Tenn. Crim. App. 1994); State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994); Manning v. State, 883 S.W.2d 635, 640 (Tenn. Crim. App. 1994); State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991); but see State v. Rickey Crawford, No. 02C01-9806-CR-00169, Shelby County, slip op. at 8-10 (Tenn. Crim. App. May 12, 1999) (Hayes, J., disagreeing with the concurring opinion by Tipton, J., who along with Lafferty, Senior J., held that subsection 115(b)(2) applies to defendants with extensive prior criminal records); cf. State v. Michael Blazer, No. 03C01-9405-CR-00185, Carter County, slip op. at 3 (Tenn. Crim. App. Feb. 3, 1995) (holding that a defendant with a prior record of one felony conviction and misdemeanor convictions did not have an "extensive record of criminal activity" under Gray and noting that the

22

"persistent offender" category was omitted from subsection 115(b)(2)). The interpretation used in the reported cases is supported by a reasonable understanding of the language of subsection 115(b)(2), i.e., an offender's <u>record</u> of criminal activity denotes his or her history of criminal activity. Moreover, this interpretation logically fills the gap between the professional criminal, <u>see</u> Tenn. Code Ann. § 40-35-115(b)(1), and the multiple offender with no previous criminal history.

This court's interpretation of subsection 115(b)(2) for the past eight years, upon which trial courts and parties have relied, now carries the weight of the doctrine of <u>stare</u> <u>decisis</u>, embodying a judicial policy to adhere to previous court decisions. This doctrine is based upon the public's need to rely upon court decisions, and it recognizes that rights may accrue in reliance upon those decisions. It has particular importance when a decision involves the interpretation of a statute. <u>See</u>, <u>e.g.</u>, <u>Monday v. Millsap</u>, 197 Tenn. 295, 298, 271 S.W.2d 857, 858 (1954). In this respect, holding today that subsection 115(b)(2) does not relate to prior histories of criminal activity would result in unnecessary litigation in the future regarding formerly sentenced people. Also, the legislature has convened in regular sessions during the past eight years without electing to modify this court's interpretation of subsection 115(b)(2). Because this interpretation is both rational and functional for the criminal justice system, <u>stare</u> <u>decisis</u> should prevail. In consideration of the defendant's numerous prior convictions, the

trial court properly found that the defendant qualified for consecutive sentences under subsection 115(b)(2).

## B. DANGEROUS OFFENDER

The defendant contends that the record does not reflect that he had no hesitation about committing the offenses, which arose out of a domestic dispute, that the offenses were not premeditated or deliberate, and that they occurred during a state of passion. The state argues that the number and seriousness of the stab wounds, the defendant's threat to put his wife in the hospital, and the unprovoked and systematic stabbing of Tameka and Tracy Parsons and John Gross reveal that the defendant had no regard for human life and did not hesitate to commit these crimes despite the great risk to human life. We agree.

The trial court may impose consecutive sentences when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(4). The trial court found the defendant to be a dangerous offender because he repeatedly stabbed four unarmed, much smaller and virtually helpless people. The trial court noted the defendant's previous convictions for reckless endangerment, aggravated assault, and simple assault and characterized the defendant as a dangerous man.

At trial, Mrs. Palmer testified that the defendant threatened to put her in the hospital and then stabbed her three

24

times. She said that at the time, she was recovering from surgery. Tameka and Tracy Parsons testified that as they attempted to help Mrs. Palmer, the defendant stabbed them each twice. They both testified that they neither said anything to the defendant nor had anything in their hands at the time they were attacked. Mr. Gross testified that the defendant chased him out of the house and stabbed him on the porch as he was trying to call for help. Finally, the presentence report reflects that the defendant has convictions for three violent crimes and three weapons offenses. We do not believe that the evidence preponderates against the trial court's finding that the defendant is a dangerous offender.

## C. <u>WILKERSON ANALYSIS</u>

The defendant contends that the trial court failed to make any findings with regard to the criteria for consecutive sentencing set forth in <u>State v. Wilkerson</u>, 905 S.W.2d 933 (Tenn. 1995). The defendant argues that this court should review the criteria <u>de</u> <u>novo</u> with no presumption that the consecutive sentences were correct. Our <u>de</u> <u>novo</u> review of the record confirms that consecutive sentences are justified based upon the <u>Wilkerson</u> criteria.

In <u>Wilkerson</u>, our supreme court stated that "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." <u>Id.</u> at 938. Here, the

25

defendant stabbed his wife, left the bedroom and stabbed the two young women trying to come to her aid, then chased a fourth victim out of the house and stabbed him in the back. Three of the victims were in critical condition following the stabbings. At the sentencing hearing, the trial court noted that there was no need to stab Mr. Gross under any claimed circumstance. We hold that the consecutive sentences reasonably relate to the severity of the offenses.

We also hold that the record reflects that consecutive sentences are necessary to protect the public from further criminal conduct at the hands of the defendant. The defendant's criminal record, which includes several violent offenses, and the present offenses, in particular, expose the defendant's inability to conform his behavior to the law. Previous attempts to rehabilitate the defendant have failed, as the presentence report reveals that the defendant violated the probation imposed as a result of his convictions for weapons offenses. We affirm the trial court's imposition of consecutive sentences.

Based on the foregoing and the record as a whole, we affirm the judgments of conviction entered by the trial court.

_____

               Joseph M. Tipton, Judge

CONCUR:

_____

Gary R. Wade, Presiding Judge

_____

Thomas T. Woodall, Judge