# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 14, 2010

## STATE OF TENNESSEE v. FABIAN CLAXTON

**Appeal from the Criminal Court for Shelby County**
**No. 07-06442    Chris Craft, Judge**

_____

**No. W2009-01679-CCA-R3-CD   -   Filed March 7, 2011**

_____

Following a jury trial, the Defendant, Fabian Claxton, was convicted of four counts of attempted first degree murder, a Class A felony, and unlawful possession of a handgun while at a public place, a Class A misdemeanor.  The Defendant was sentenced to consecutive sentences of 22 years for each of the four attempted first degree murder convictions and a concurrent sentence of 11 months and 29 days for the unlawful possession of a handgun while at a public place conviction, for a total effective sentence of 88 years.  In this appeal as of right, the Defendant contends that (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred in instructing a witness to identify the Defendant; and (3) the trial court improperly imposed consecutive sentences.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Charles Mitchell (on appeal) and Larry Copeland (at trial), Memphis, Tennessee, for the appellant, Fabian Claxton.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; William L. Gibbons, District Attorney General; and Dean DeCandia and Colin A. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On May 22, 2007, the Defendant, wearing a blue bandana that covered the lower part of his face, approached the Riverview Park at the Riverview Community Center in Memphis,

Tennessee and fired a .40 caliber revolver into the air. After firing into the air, the Defendant began shooting toward the basketball court with a semi-automatic handgun and the .40 caliber revolver, injuring three teenagers, Demarcus Fleming, Blessing Pollard, and Frederick Buford, who had attempted to run away when the Defendant began shooting. There were several other teenagers and children sitting near and playing on the basketball court that also ran but were not injured by the Defendant.

In the investigation that followed, Investigator Jeffrey Garey of the Memphis Police Department found four Winchester .40 Smith & Wesson bullet shell casings and six .25 automatic bullet shell casings near where the Defendant had been reportedly standing as he shot toward the basketball court. When the Defendant was apprehended the next day, Officer John Gorley of the Memphis Police Department found a small handgun and a purse in the Defendant's vehicle. In the purse, officers found a box of Remington .25 caliber ammunition and a blue bandana. The handgun was a 6.32 millimeter handgun, which is equivalent to a .25 caliber handgun and can fire .25 caliber ammunition. Officer Gorley did not find a carrying permit for the weapon even though a permit is required when possessing a weapon upon a public road "in the fashion that that gun was being transported."

Once at the police station, the Defendant waived his Miranda rights and confessed to his involvement in the shooting. Detective Robert Wilkie of the Memphis Police Department transcribed the Defendant's statement, which was signed by the Defendant. In his statement, the Defendant admitted that he and Antonio Malone were responsible for shooting Frederick Buford, Blessing Polard, and Demarcus Fleming. He stated that he was intending to shoot Jeremy Gray. According to him, there were only two people, Jeremy Gray and a person named A.J., on the basketball court when he began shooting. He was on the "top of the hill for the first shots," and he was "by the bridge" for the "second shots."

In his statement, the Defendant said that prior to the shooting, Antonio Malone had talked to Jeremy Gray, who told Antonio Malone that he believed that the Defendant and Antonio Malone had shot "some dope boy" and that he was looking for them and that "some GD's were looking" for Antonio Malone. When the Defendant told Antonio Malone that he wanted to "confront" Jeremy Gray about the situation, Antonio Malone told the Defendant that Jeremy Gray "had a gun on him." The Defendant said that when they approached the park, Antonio Malone had the .40 caliber revolver while he had the .25 semi-automatic. The Defendant told Antonio Malone that he would not shoot toward the basketball court because "there were too many kids." They eventually decided that Antonio Malone would "fire a couple of shots to scare the little kids off." After Antonio Malone "shot a couple of times down there," the Defendant took back the gun and "shot the rest of the shots out of the gun" and "shot the [.25 semi-automatic] in the air until it was empty." The Defendant stood on the bridge for 15 or 20 seconds and after seeing that there "wasn't no kids out there laying

or screaming," he "ran back to the car" and gave the .40 caliber revolver back to Antonio Malone. Upon further questioning, the Defendant told Detective Wilkie that he shot the .25 caliber semi-automatic into the air but that he "shot at Jeremy with the [.40 caliber revolver]."

At trial, Ortanio Sharp, who was 15 years old at the time of the trial and in State's custody for unrelated charges, testified that he observed Antonio Malone and Jeremy Gray talking on May 22, 2007, sometime before the shooting. He believed that Jeremy Gray had confronted Antonio Malone, and he heard Antonio Malone say that he was going to find the Defendant. After observing the two talking, he went to his boss's house for approximately 15 minutes before returning to the park.

Once he arrived back at the park but before he stepped onto the basketball court, he heard people say, "[T]here go Fay."[1] He turned around and saw whom he believed to be the Defendant fire a revolver into the air before firing toward Jeremy Gray, who was standing on the basketball court. The Defendant had a "black rag across his face" and was "wearing a hoodie over his head" while standing on a bridge that was near the basketball court. After seeing the Defendant fire the first shot into the air, Ortanio Sharp saw the Defendant lower his weapon before firing more shots. As Ortanio Sharp was running away, he heard gunshots coming from a semi-automatic weapon. He returned to the basketball court when he heard Blessing Pollard screaming. He admitted that he was unable to positively identify the Defendant as the shooter but stated that the shooter looked like the Defendant and that he had heard that others had identified the Defendant as the shooter. He stated that there were "about" 21 kids in the area when the shooting occurred.

Demarcus Fleming, who was 15 at the time of the trial but 14 at the time of the shooting, testified that on May 22, 2007, he was sitting on a bench with his 12-year-old sister, Cashondra Fleming; his 12-year-old friend, Demetrius; and Blessing Pollard. He was at the park watching "A.J." and Jeremy Gray play basketball for approximately ten minutes when he heard gunshots. He turned toward the sound of the gunshots and saw a "dark skin dude with a [bandana] over his face." The man "had two guns in his hands" and was pointing the weapons toward the basketball court. He ran toward the railroad tracks with Cashondra Fleming and Demetrius. Blessing Pollard tried to run with them but fell on the ground. After approximately ten minutes, Demarcus Fleming stopped and realized that he had been shot in the back of his left leg and that Fredrick Buford had been shot. They returned to the basketball court to find that Blessing Pollard had also been shot and was "losing a lot of blood."

---

[1]Several witnesses testified that the Defendant was commonly referred to as "Fay" or "Faith."

Blessing Pollard, who was 16 at the time of trial and in the State's custody for unrelated charges, testified that she was at Riverview Park sitting on a bench with Demarcus Fleming and others on May 22, 2007. They were watching Jeremy Gray and others play basketball when she noticed Jeremy Gray looking up. She turned around and saw a person with two guns in his hands. The person was aiming the guns toward Jeremy Gray. She could not remember how many times the person fired the weapons. She could not identify the shooter, but she stated that the shooter was wearing a "scarf on his mouth" and that there was only one shooter. She stated that she was shot in the back of her right calf.

Frederick Buford, who was 16 at the time of trial, testified that on May 22, 2007, he was at the Riverview Park playing basketball with Jeremy Gray, Demarcus Fleming, A.J., and others. As they were playing, he heard gunshots. He stated that when he heard gunshots and saw everybody running, he ran toward the railroad tracks. He eventually realized that he had been shot in the upper back; the bullet ended up in his neck. He could not identify the shooter.

Jeremy Gray, who was 17 at the time of trial and in State's custody for unrelated charges, testified that he went to the Riverview park with Aven Farrow to play basketball on May 22, 2007. He stated that he had a 10 or 15-minute conversation with Antonio Malone "right before" he started playing basketball. He stated that Antonio Malone asked him about "Clavin and Fay." He stated that approximately three weeks prior to May 22, 2007, he and the Defendant had a dispute at the Crystal Palace skating rink about the Defendant "shooting in the neighborhood." However, he stated that this dispute was not the topic of the discussion that he had with Antonio Malone on May 22, 2007.

Mr. Gray testified that on May 22, 2007, he was not armed while he was playing basketball. He said that while he was on the basketball court, he saw a person wearing a blue bandana around his mouth standing on the bridge near the basketball court and that he believed that this person was the Defendant because the Defendant "was the only problem [he] had in the neighborhood." Jeremy Gray further stated that he recognized how the Defendant walked and "how his body shaped up." He said that he ran when the Defendant raised a handgun and pointed it toward him. He said that as he was running, he heard "different shots come from different guns" and that he heard eight or nine gunshots before he stopped running. When he returned to the basketball court, he called 9-1-1 with his cellular telephone because he saw that a little girl had been shot.

The Defendant, who was 20 at the time of trial but 19 on May 22, 2007, testified at trial that he went to the park to talk with Jeremy Gray. He said that as he was walking over the bridge to the basketball court, he called out to Jeremy Gray, waving and raising his hand to get his attention. When he saw Jeremy Gray reaching for what he believed was a weapon

-4-

hidden under a t-shirt, he began shooting with a .40 caliber revolver that Antonio Malone had handed him as they were walking toward the park. He admitted that he also used a .25 that he had bought from Antonio Malone. He said that he brought weapons with him because Antonio Malone had told him that Jeremy Gray was armed and wanted to kill him. He said that he was carrying the weapons because he feared for his life.

The Defendant stated that he was wearing a white shirt and a black hat that was "turned to the back" and that he did not have anything covering his face. He stated that he did not mean for anyone to get hurt and that he only returned to his car after he scanned the area and found that nobody was yelling or screaming. He admitted that he saw two or three people sitting on the bench beside the basketball court when he shot toward Jeremy Gray, but he stated that he did not see Blessing Pollard lying on the ground when he scanned the area.

Relative to his apprehension, he stated that he did not know that there was a bandana in the purse in his car. He stated that he asked his sister if he could borrow the purse to store the gun and the ammunition that Antonio Malone had given him. He admitted that he gave a statement at the police station that was contrary to his trial testimony, but he explained that his statement differed from his testimony because the detective was arguing with him and telling him what to say.

The Defendant's mother, Constance Claxton, testified at trial that Antonio Malone was not allowed to come to her house and that despite her instructions, Antonio Malone was at her house on May 22, 2007. She said that she told Antonio Malone to leave and that the Defendant left with Antonio Malone but returned 30 or 45 minutes later. The Defendant's friend, Oscar Brent, testified that he worked with the Defendant and that he believed the Defendant was a "reliable and trustworthy employee."

ANALYSIS

I. Sufficiency

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not re-weigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to the evidence were resolved by the jury.

State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

### A. Attempted first degree murder

The Defendant contends that the evidence is insufficient to support his conviction of attempted first degree murder of Jeremy Gray because he feared for his life. Relative to the other counts, the Defendant contends that he never intended to hurt or kill anyone. He asserts that the innocent bystanders were either unable to identify him or were forced to identify him and that Jeremy Gray was a violent young man who held a grudge against the Defendant. The State responds that the evidence is sufficient to sustain his conviction of attempted first degree murder of Jeremy Gray because he approached the victim, armed with two weapons and with his face partially covered with a bandana before shooting at the victim approximately ten times. The State further responds that the evidence was sufficient to sustain his convictions of attempted first degree murder of Demarcus Fleming, Blessing Pollard, and Frederick Buford because "in his attempt to kill Jeremy Gray, the [D]efendant shot those victims instead."

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. 39-13-202(d) (internal quotations omitted). The element of premeditation only requires the Defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Factors from which a jury may infer premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of the intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. A person attempts to commit first degree murder when "acting with the kind of culpability otherwise required," a person

(1)  Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2)  Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

As an initial matter, we will address the Defendant's contention that because witnesses were either biased or were unable to identify him, the evidence was insufficient. The Defendant admitted at trial that he fired two handguns in the air and toward Jeremy Gray and that he knew there were innocent bystanders on the basketball court and sitting on the bench near the basketball court.[2]  Additionally, Jeremy Gray and Ortanio Sharp identified the Defendant as the shooter.  Any questions regarding the credibility of the witnesses were resolved by the jury.  Accordingly, we conclude that the evidence was sufficient to establish that the Defendant was the shooter.

Relative to Jeremy Gray, the Defendant appears to contend that he acted in self-defense.  In order to prevail with a theory of self-defense, the Defendant would have had to prove that he had a "reasonable belief that there [wa]s an imminent danger of death or serious bodily injury" and that he believed that his use of force was "immediately necessary to protect" himself from the victim's "attempted use of unlawful force."  See Tenn. Code Ann. § 39-11-611(a).  The Defendant would also have had to prove that his belief of imminent death or serious bodily injury was "real, or honestly believed to be real at the time," and "founded upon reasonable grounds."  See Tenn. Code Ann. § 39-11-611.

While the Defendant testified that Jeremy Gray was reaching for a weapon, the jury heard the proof regarding self-defense and rejected the Defendant's assertion.  Indeed, the Defendant even admitted at trial that he never actually saw Jeremy Gray with a weapon; instead, he stated that Jeremy Gray ran toward his t-shirt and that he believed that Jeremy

---

[2] The Defendant admitted that a person named "A.J." was on the basketball court with the Defendant and that there two or three people sitting on the bench or "bleachers" near the basketball court.

Gray had a weapon hidden under the shirt. Moreover, in the Defendant's statement, the Defendant recounted a planned, well-thought out attack of Jeremy Gray in which several shots would be fired into the air to scatter the innocent bystanders before the Defendant attempted to shoot Jeremy Gray. The evidence reflected that the Defendant fired his weapon approximately ten times as Jeremy Gray and bystanders ran away. Blessing Pollard testified that the Defendant aimed his weapon at Jeremy Gray before firing, and Jeremy Gray testified that the Defendant aimed his weapon at him before firing. Thus, the Defendant acted "with intent to cause a result that is an element of the offense, and believe[d] the conduct w[ould] cause the result without further conduct on [his] part." Tenn. Code Ann. § 39-12-101(a)(2); see Joseph Jackson v. State, No. W2006-00606-CCA-R3-HC, 2007 WL 273649, at *3 (Tenn. Crim. App. Jan. 31, 2007) (stating that pulling a gun and firing that gun at someone would be sufficient evidence to support a conviction of attempted first degree murder). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction of the attempted first degree murder of Jeremy Gray.

Relative to the bystanders, Demarcus Fleming, Blessing Pollard, and Frederick Buford, our supreme court has held that "[t]he definition of 'intentional' in the statute does not require the State to prove that the defendant killed the intended victim." Millen v. State, 988 S.W.2d 164, 165 (Tenn. 1999). Furthermore, "it is unnecessary to resort to the common law doctrine of transferred intent under our first degree murder statutes" in determining the sufficiency of the convicting evidence. Id. The supreme court held that when a person kills an unintended victim, that person may be convicted of first degree murder committed in the perpetration of or attempt to perpetrate any first degree murder – felony murder or first degree premeditated murder. Id. at 168-69. In Millen, the Defendant was attempting to kill Tony Gray, a rival gang member, when he inadvertently shot Lanetta King, a 14-year old bystander. Id. at 165. In holding that the defendant was guilty of the first degree premeditated murder of Lanetta King, the supreme court stated that a person acts intentionally "'with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.'" Id. at 168 (quoting Tenn. Code Ann. § 39-11-302). The supreme court further stated,

> A plain reading of this statute as applied to first degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder.

Id. at 168 (Tenn. 1999). The fact that the Defendant was convicted of attempted first degree

murder does not lessen the applicability of the supreme court's reasoning in Millen. This court has stated that when a person attempts to kill someone but inadvertently injures another, the defendant may be convicted of the attempted first degree murder of the unintended victim. Joseph Jackson, 2007 WL 273649, at *4. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction when the evidence introduced at trial reflected that the Defendant attempted to kill Jeremy Gray but instead shot Demarcus Fleming, Blessing Pollard, and Frederick Buford.

## B. Unlawful possession

The Defendant contends that the evidence was insufficient to sustain his conviction of unlawful possession of a weapon while at a public place but offers no argument in support of this assertion. The State responds that this issue should be waived for the Defendant's failure to comply with Tennessee Court of Criminal Appeals Rule 10(b).

Issues that "are not supported by argument, citation to authorities, or appropriate references to the record" may be waived by this court. Tenn. Ct. Crim. App. R. 10(b). Regardless of waiver, the Defendant is not entitled to relief on this issue. The conviction of unlawful possession of a handgun while in a public place requires proof that the Defendant carried a handgun while "at a place open to the public where one (1) or more persons were present." Tenn. Code Ann. § 39-17-1307(a)(2)(c) (2006). The Defendant admitted that he possessed two handguns while at the Riverview Community Park and that he possessed one handgun while driving in his car before he was apprehended. There was no evidence to suggest that the Defendant had a carrying permit for the weapons. Accordingly, we conclude that the evidence was sufficient to sustain his conviction.

## II. Identification at trial

The Defendant contends that the trial court erroneously instructed a witness, Ortanio Sharp, to identify the Defendant and that the trial court's order influenced the witness's testimony because the witness only complied with the order after the trial court threatened to hold the witness in contempt and send him to jail. The Defendant further contends that the witness should have been allowed to consult an attorney to explain "what penalties could occur if he did not testify." The State responds that the trial court "properly required the witness to point at the defendant to identify him." The State asserts that the witness had already identified the Defendant and was merely refusing to point at the Defendant; therefore, the trial court's instruction to the witness did not influence the witness's testimony and did not prejudice the defense.

The record clearly indicates what occurred in the trial court as relevant to this issue, and we believe that a recitation of the line of questioning is appropriate here:

Attorney: Was anybody with Malone?

Witness: No, not at the time but Malone had contact with Fay.

Attorney: With who?

Witness: Fay.

Attorney: Do you know Fay's real name?

(No audible response)

Attorney: Do you see Fay here in court?

Court: I'm sorry, do you know Fay's real name and you just moved your head. Is that a yes or a no?

Witness: No.

Court: Okay.

Attorney: Do you see Fay in the courtroom today?

Witness: Yep.

Attorney: All right. What I want you to do is this person that you refer to as Fay, I want you to point him out for the jury and describe him enough so that they know who you're talking about in the courtroom?

Witness: Ya'll know who I'm talking about. I don't have to point him out.

Attorney: I know that you know but the jury doesn't. So if you could point him out for the jury and describe him.

Witness: I ain't pointing.

Court: All right. Let's - -

Witness: No sense pointing.

At this point, the trial court sent the jury out of the courtroom before engaging in further discussion with the witness. The trial court instructed the witness that he could be charged with contempt if he did not cooperate and testify as directed by the State. The trial court noted for the record that the witness was smiling and appeared to be amused by the colloquy before specifically instructing the witness that he would be held in contempt if he refused to cooperate. The trial court further stated,

You're refusing to testify. And I'm telling you that as part of your testimony if you're asked to point, you have to point, if you can point someone out. If there is no one for you to point out, obviously, no. But you said, yes, but I refuse to point. So you're refusing to testify in this case. That's what I take

-10-

it as. So I want to know now, are you going to refuse to testify and violate my court order or are you not going to?

In response, the witness asked to speak with the prosecutors. The trial court informed the witness that he could not speak with them because he was in the middle of his testimony. Defense counsel suggested that they should call the public defender's office and have an attorney appointed. The trial court continued his discussion with the witness and repeatedly told the witness that if he refused to testify in the manner in which he was instructed, he would be held in contempt of court. The trial court told the Defendant that an attorney could be appointed to represent him but cautioned the witness that his refusal to testify could "mess up the rest of his life." Eventually, the witness agreed to testify and ultimately identified the Defendant as the person whom he referred to as Fay.

When the trial court intervened, the witness had already indicated that "Fay" was in the courtroom but had simply refused to point him out for the jury's benefit. The trial court never told the witness that he had to point at the Defendant. On the contrary, the trial court told the witness that if the person whom he believed to be Fay was in the courtroom, he was required to follow instructions and point to that person.

"[M]atters pertaining to the examination of witnesses" are entrusted to the sound discretion of the trial court. State v. Schiefelbein, 230 S.W.3d 88, 133 (Tenn. Crim. App. 2007) (citing State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)). "Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion." Id. As the witness had already stated that Fay was in the courtroom, the trial court's instructions did not influence the witness's testimony. Moreover, the Defendant was not prejudiced by the event because the witness was instructed outside of the jury's presence. Accordingly, we conclude that the trial court did not abuse its discretion in instructing the witness.

### III. Sentencing

The Defendant does not challenge the length of his sentence but contends that the trial court erred in imposing partial consecutive sentences because imposition of the consecutive sentences was not warranted given the facts of the case. The Defendant further contends that the trial court's finding relative to his "unwillingness to lead a productive life is an assumption based on the nature of the crime and is not based in fact." The Defendant asserts that there was no proof in the record to support the trial court's conclusion that "he resorted to criminal activity in furtherance of an anti-societal lifestyle." The State responds that the record supports the trial court's sentencing decision because the trial court properly determined that the Defendant was a dangerous offender and that the aggregate length of the

sentence reasonably related to the severity of the offenses. The State also submitted the Defendant's lengthy juvenile criminal history, which included juvenile adjudications for disorderly conduct, burglary, theft, vandalism, and assault.

In imposing consecutive sentences, the trial court stated, "I find that [the Defendant] is not only a dangerous offender, but an extremely dangerous offender" because the Defendant's behavior indicated "little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." The trial court discussed the crime and the Defendant's history contained in the pre-sentence report and found that "the circumstances surrounding the commission of this offense [we]re aggravated;" that confinement was "necessary to protect society from his unwillingness to lead a productive life;" and that the aggregate length of the sentence "reasonably relate[d] to the offense of which [the Defendant stood] convicted." The trial court said that the aggregate length of the sentence was a "problem" but concluded that 88 years was "not too much . . . of a sentence for these offenses" considering the circumstances of the crime and the fact that the Defendant would be "looking at a thirty percent parole eligibility on these cases."

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2005). The appealing party has the burden of showing that the sentence is improper. However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If review of the record reflects that the trial court properly considered all relevant factors, gave due consideration to each factor, and its findings of fact are adequately supported by the record, this court must affirm the sentence. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Should the record fail to demonstrate the required considerations by the trial court, then appellate review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states, in pertinent part, that the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4) (2006). When imposing consecutive sentences based on the defendant's status as a dangerous offender, the trial court must, "in addition to the application of general principles of sentencing," find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d

933, 939 (Tenn. 1995).  In all cases where consecutive sentences are imposed, the trial court is required to "specifically recite [on the record] the reasons" behind imposition of consecutive sentences.  See Tenn. R. Crim. P. 32(c)(1); see, e.g., State v. Palmer, 10 S.W.3d 638, 647-48 (Tenn. Crim. App. 1999) (noting the requirements of Rule 32(c)(1) for purposes of consecutive sentencing).

As noted above, the trial court discussed the reasons behind his sentencing decision on the record.  Following our review, we conclude that the record does not preponderate against the trial court's reasoning and ultimate sentencing decision and that the effective sentence imposed was not greater than that deserved for the offenses in this case.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE