IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 11, 2017

**STATE OF TENNESSEE v. MELANIE C. MOORE**

**Appeal from the Criminal Court for Hamilton County**
**No. 297629   Thomas C. Greenholtz, Judge**

_____

**No. E2017-00027-CCA-R3-CD**

_____

Melanie C. Moore, the Defendant, entered an open plea of guilty to Class C felony theft of property valued at $10,000 or more but less than $60,000 (Count 1), Class D felony, theft of property valued at $1,000 or more but less than $10,000, (Count 2), Class E felony reckless endangerment (Count 3), and Class A misdemeanor escape (Count 4). The trial court sentenced the Defendant to four and one-half years on Count 1, three years on Count 2, two years on Count 3, and three months for Count 4. The trial court ordered Counts 2, 3 and 4 to be served consecutively to Count 1 but concurrently with each other for an effective sentence of seven and one-half years. The trial court ordered Count 1 to be served in the Department of Correction and suspended the other sentences. On appeal, the Defendant argues that the trial court abused its discretion in its sentencing decisions. After a thorough examination of the facts and applicable case law, we affirm the sentences except for the partial consecutive alignment of the misdemeanor escape. We remand for correction of the judgment sheets to provide for consecutive alignment of Count 4 with Counts 2 and 3.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Steve Smith, District Public Defender, and Coty Wamp, Assistant District Public Defender, for the appellant, Melanie C. Moore.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Neal Pinkston, District Attorney General; and Ancharlene Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

The facts underlying the Defendant's guilty plea were set out in the Defendant's presentence report as the following:[1]

On October 1[4], 2015, at approximately [5:36 p.m.,] police were dispatched to [Camp Jordan Park][2] concerning a motor vehicle theft that had occurred. Dispatch advised that the victim[,] Brittany Walston[,] was following [the Defendant, who was driving the victim's] . . . vehicle. Police were given a vehicle description of a white 2010 Volkswagen Jetta and were advised that the vehicle had stopped at 400 Scruggs Road. Police located the vehicle and made contact with [the Defendant].

The vehicle was confirmed to be the stolen vehicle from Camp Jordan. [Ms.] Walston advised police that she had just parked at Camp Jordan Park when the [Defendant] jumped in the back seat and started yelling "Give me a f[***]ing ride." [Ms.] Walston got out of the vehicle and the [Defendant] then drove off with the vehicle. Upon further investigation[,] it was found that the [Defendant] had also stolen a vehicle with two juvenile children inside in Catoosa County, Georgia. The description of the stolen vehicle from Catoosa County was a 2001 black Ford Escort. This vehicle and the two missing juveniles were also recovered at Camp Jordan Park. Witnesses advised that the [Defendant] drove the Ford Escort through the chain link fence, across the playground with children present, through a second section of the fence, across the field at the amp[hi]theater, an[d] then attempted to drive through a third section of the fence where the vehicle was disabled. [The Defendant] was taken into custody for two counts of theft and two counts of reckless endangerment. While police walked [the Defendant] into the East Ridge Police Department for booking[,] [the Defendant] fled on foot from police. Police caught [the Defendant] in the parking lot and escorted her inside the building. Police stated [that] charges would follow in Catoosa County.

---

[1] The Defendant did not file a transcript of the plea colloquy. Thus, we rely on the presentence report for a summary of the facts.

[2] The Defendant's offenses began in Georgia and ended in Camp Jordan Park in Chattanooga.

The Defendant entered an open plea of guilty to theft of property valued at $10,000 or more but less than $60,000, theft of property valued at $1,000 or more but less than $10,000, reckless endangerment, and misdemeanor escape.

*Sentencing Hearing*

At the Defendant's sentencing hearing, Detective Tim Deal testified that he worked for the Catoosa County Sheriff's Department in Georgia and that he specialized in crimes against children. He stated that he became involved with the Defendant's case on October 14, 2015. Detective Deal responded to the scene where the two minor children were kidnapped in Ringgold, Georgia, and interviewed witnesses. He explained that the Defendant kidnapped the two children, ages seven and five, while the children's mother visited a family member. Approximately an hour and ten minutes later, Detective Deal was notified that the East Ridge Police Department had found the missing children and vehicle. On cross-examination, Detective Deal agreed that a witness stated that, at the Camp Jordan Park, the minor victims exited the vehicle and were playing on the playground while the Defendant was "on the cell phone." The witness also stated that the Defendant attempted to get one of the minor victims back into the vehicle and then drove in circles around the park and wrecked into a fence.

H.P.[3] testified that she lived in Georgia with her five and six years old sons at the time of the offenses. On the day of the offenses, H.P. drove her brother-in-law to his house with her children in the backseat of her 2001 black Ford Escort. After arriving, H.P. ran into the house to pick up her gas money while her children slept in the backseat. She explained that she asked her brother-in-law to stand next to the vehicle while she ran inside, but he came inside. When H.P. exited the house, her vehicle and her minor children were gone. Approximately an hour and ten minutes after she called 911, H.P. learned that her vehicle and children had been located at Camp Jordan Park. H.P. stated that she did not know the Defendant and had not seen her before the offenses.

L.P. stated that he was eight years old and in the second grade. L.P. stated that, on the day of the offenses, his mother picked him and his brother up from school; he got into the backseat of the vehicle and fell asleep. When he woke up, another woman was driving the vehicle, and his brother was still asleep in the backseat. L.P. stated that the woman drove the vehicle to a horse farm, where she stopped the vehicle. The woman got out of the vehicle and used her phone for approximately twenty minutes. The woman then drove to a playground, where L.P. and his brother got out of the vehicle and began

---

[3] It is the policy of this court to identify minor victims and their relatives by their initials to protect their identity. We intend no disrespect.

playing. Then the woman restarted the vehicle and she "was backing up and then she came back and she almost hit [L.P.]." The woman drove the vehicle through a fence, and a man helped him get out of the way of the vehicle. The vehicle got stuck in the fence, and the woman "got out and ran."

Kayla Clay testified that on October 14, 2015, she was walking at Camp Jordan Park when she "heard a really loud noise that sounded like tires squealing and then like metal scraping." Ms. Clay walked around the edge of the amphitheater and observed a "black car out in the field and it was just like the dirt was going everywhere." The black vehicle then attempted to drive through a fence but got stuck. Ms. Clay went to the playground and saw a man with several children who stated that "the lady had just dropped the kids off there." Ms. Clay asked the children if the woman driving the vehicle was their mother; they responded that they did not know her. Ms. Clay called 911 to report the incident and stayed with the children.

The Defendant testified that she was originally from Georgia; she became pregnant at fifteen and moved out of her family's house. She stated that she had two adult children and one minor child. The Defendant explained that she cared for her minor child until she was incarcerated for the current offenses; her minor child was currently in foster care. She stated that she was "going to do everything in [her] power to get [her minor child] back." The Defendant stated that her father was currently incarcerated, and her mother was out on bond. She stated that she was employed at Bud's Sports Bar "[o]n and off for seven years" until May 2015. The Defendant admitted that she had used marijuana from the age of twelve and that she "took pills a lot." Regarding her mental health, the Defendant explained that, in 2015, her grandfather and best friend died; she was in a car accident; and she lost her job and apartment. The Defendant stated that she remembered that her cousin sexually assaulted her as a child and that she experienced paranoia. She stated that she heard voices that told her she needed to go to jail and that she "called the police on [her]self." She also heard Bible verses in her head, specifically that she needed to "lie down in green pastures," and she believed that the "mafia" was following her.

On October 14, 2015, the Defendant walked down the street, and she saw a black vehicle in a driveway. She saw a woman walk into a house next to the driveway, and a man "walked in right behind her." She stated that the man said "hey girl" to her, and she "thought [that] he was giving [her] a sign that [she] needed to walk over there." When she walked over to the vehicle, she saw that the keys were in the vehicle, and she "thought it was a good way to go [to] jail." She explained that she did not want to go to jail, but "the voices told [her] to." She got into the vehicle and began to back the vehicle out of the driveway when she realized that children were in the backseat. She stated that the children "started waking up and they were acting like they knew [her] and said they

- 4 -

had their bags packed in the back." The Defendant continued to back the vehicle out of the driveway and drove off. While she was driving, the Defendant saw a sign with kissing sea horses and decided to pull over. She then drove to the playground at Camp Jordan Park. She stated that the children "told [her] that they had their scooter in the trunk so [she] popped the trunk and they rode their little scooters around." The Defendant observed a man and a little girl who were also at the park. The Defendant got back in the vehicle, did "doughnuts" in a field next to the playground, and then "parked the car into the fence[.]" She then "ran across [to] where [she] had done the doughnuts and opened the back door of the girl's Jetta and said will you give me a ride down the street." The Defendant drove off in the Jetta but later parked and waited for police to arrive. After she was taken to the police department, she explained that she "stumbled a couple of steps because [she] ha[d] . . . the rod in [her] leg . . . ." The Defendant asserted that she did not run from the police officer.

The Defendant testified that she did not know what her intentions were when she took H.P.'s vehicle. She stated that she "thought [she] was doing something crazy to get into heaven like the letter said." She explained that she had never seen a mental health professional until she was incarcerated for the current offenses. She stated that, after she was incarcerated, she began taking an antipsychotic medication, a mood stabilizer, and a medication for "side effects." Her mental health symptoms lasted for about two months after the offenses while she was housed in solitary confinement. The Defendant believed that she could successfully complete probation, and she intended to continue taking her medications and obtain mental health treatment. The Defendant accepted responsibility for her actions.

On cross-examination, the Defendant agreed that she had previously been convicted of other offenses, such as leaving the scene of an accident in 2015, driving under the influence in 2014, possession of marijuana in 2004, and forgery and theft in 2002. The Defendant agreed that, at the time of offenses, she was living with her mother in a house down the street from H.P.'s house. The Defendant denied that, on the day of the offenses, her family members offered to help her with her drug problem and that she refused assistance. She was also not aware that her minor child reported that the Defendant had used methamphetamine and heroin on the offense date.

Jerry Presley stated that he had known the Defendant for approximately seven years. He stated that the Defendant was not dangerous and that he would support her if she received an alternative sentence. He believed that the Defendant was a smart and courteous person. On cross-examination, Mr. Presley testified that he was not aware of the Defendant's substance abuse or mental health issues prior to the offenses.

Stacy Thompson testified that she had known the Defendant since she was seven years old and that the Defendant was one of her best friends. Ms. Thompson stated that the Defendant was a good mother to her children. She also stated that she had recently been diagnosed with leukemia and that she needed the Defendant's help. Ms. Thompson noticed a change in the Defendant's behavior approximately one month prior to the offenses. She explained that the Defendant called her, and when Ms. Thompson went to the Defendant's house, the Defendant said that "they were coming" and that "they were watching her." Ms. Thompson took the Defendant to visit a doctor and spoke with the doctor about the Defendant's strange behavior. Ms. Thompson admitted that she was aware that the Defendant used marijuana, prescription pills, and methamphetamine. She stated that the Defendant was not violent and that she did not act recklessly around children. On cross-examination, Ms. Thompson stated that she was aware of the Defendant's prior convictions, which did not change her opinion of the Defendant. She stated that "whenever [the Defendant] uses[,] she is a different person." She agreed that methamphetamine can make a user paranoid.

The trial court considered evidence presented at the sentencing hearing, the presentence report, the statutory principles of sentencing, the parties' arguments, "the nature and characteristics of the criminal conduct involved," "the statistical information provided by the Administrative Office of the Courts . . . [,]" the statements of witnesses, and the Defendant's potential for rehabilitation and treatment. The trial court found that the Defendant was a Range I Standard offender. Regarding mitigating factors, the trial court found that the Defendant's theft offenses "neither caused nor threatened serious bodily injury." However, the trial court gave this mitigating factor "little weight" because theft offenses are not classified as "against a person[.]"

The trial court also found that "the [D]efendant was suffering from a mental or physical condition that significantly reduced the [D]efendant's culpability for the offense." The trial court noted that the Defendant's voluntary drug use did not fall under this factor. The trial court stated that the Defendant had been diagnosed with "acute stress disorder, opioid use disorder, and anxiolytic use disorder"[4] by a medical professional. However, the trial court also noted that "at least to some extent some of the episodes that were described as evidencing a mental condition may have other explanations[]" and that the trial court was "hampered" by the lack of medical evidence, such as testimony from a medical professional. The trial court noted that both the Defendant and Ms. Thompson testified about the Defendant's symptoms, which had

---

[4] Dr. Luke Queen examined and diagnosed the Defendant with the listed disorders; he later set out his findings and conclusions in a letter. This letter was attached to the Defendant's sentencing memorandum that was submitted to the trial court prior to the sentencing hearing.

"some hallmarks of paranoid schizophrenia[]" because the Defendant reported hearing voices and experiencing delusions. However, the trial court gave this mitigating factor "insignificant weight" because the Defendant did not establish a causal link between her mental health issues and her criminal behavior. The trial court also applied the mitigating factor of "any other factor consistent with the purposes of the chapter" because the Defendant eventually released the minor victims from the stolen vehicle and because both vehicles that the Defendant stole were recovered, although H.P.'s vehicle was no longer operable. The trial court also noted that the Defendant's good work ethic weighed in her favor. The trial court acknowledged that the Defendant had strong support from Ms. Thompson but gave this factor little weight. The Defendant's willingness to continue treatment for her mental health and her remorse for her actions also weighed in her favor.

Regarding enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions based on three forgery convictions, leaving the scene of an accident, driving under the influence, possession of marijuana, and theft. The trial court also considered the Defendant's criminal behavior of uncharged drug use under this factor; in the presentence report, the Defendant reported using marijuana from the age of twelve and using methamphetamine. The trial court gave this factor "significant weight." The trial court also found that, before sentencing, the Defendant failed to comply with the conditions of a sentence involving release into the community because the Defendant was on probation when she committed the current offenses. The trial court found that the Defendant possessed or employed a deadly weapon, the stolen vehicle, during the commission of the reckless endangerment offense; the trial court gave this factor some weight. The trial court also found that the Defendant had no hesitation about committing reckless endangerment when the risk to human life was high because she "took a moment to reflect and had no hesitation about continuing." However, the trial court did not give this factor much weight.

The trial court found that consecutive sentencing was appropriate in the Defendant's case because "the preponderance of the evidence establishe[d] that the [D]efendant [wa]s an offender whose record of criminal activity . . . [wa]s extensive." The trial court noted that the Defendant had been previously convicted of three felonies and had pled guilty to three felonies in the current case. Accordingly, the trial court sentenced the Defendant as follows:

| Count | Offense | Offense Classification | Length of Sentence | Alignment |
|-------|---------|------------------------|--------------------|-----------|
| Count One | Theft of property valued at $10,000 or more but less than $60,000 | Class C felony | 4.5 years | |

| Count Two | Theft of property valued $1,000 or more but less than $10,000 | Class D felony | 3 years | Consecutive to count one |
|---|---|---|---|---|
| Count Three | Reckless Endangerment | Class E felony | 2 years | Consecutive to count one; concurrent to count two |
| Count Four | Escape | Class A misdemeanor | 3 months | Consecutive to count one; concurrent to counts two and three |

The trial court found that "the aggregate sentence [wa]s reasonably related to the severity of the offenses involved[,]" that the sentence was "no greater than that deserved to the offenses committed," and was "the least severe measure necessary to achieve the purposes for which the sentence [wa]s being imposed[.]"

Regarding the manner of service, the trial court found that the Defendant was a favorable candidate for an alternative sentence. The trial court considered the presentence report, the Defendant's background, her physical and mental condition, her social history, whether the Defendant's "character and attitude indicate[d] that she [wa]s unlikely to commit other offenses[,]" and "whether the imprisonment of the [D]efendant would entail excessive hardship to herself or her depend[e]nts." The trial court noted that the Defendant would likely commit other criminal offenses if she did not receive treatment for her substance abuse issues. The trial court also considered the Defendant's potential or lack of potential for rehabilitation; the trial court noted that the Defendant expressed remorse for her actions but that she "had other opportunities where she has served on probation and those opportunities have failed admittedly." The trial court also noted that the Defendant "ha[d] not undertaken, at least prior to these cases, an attempt to seriously achieve sobriety and maintain recovery for her drug addiction." The trial court found that measures less than confinement had previously been unsuccessfully applied to the Defendant and that the Defendant had a "long substantial history" of criminal behavior and a "significant criminal record." The trial court also considered the facts and circumstances surrounding the offenses and the nature and circumstances of the Defendant's criminal behavior. The trial court noted that the Defendant could have been charged with kidnapping the minor victims and that the Defendant testified that she knew the minor victims were in the vehicle when she backed out of the driveway but did not stop her conduct. The trial court found that the nature of the offenses was "truly horrendous[]" and that the offenses were "essentially one continuing course of conduct."

The trial court also found that the theft offenses and the reckless endangerment offense were "of an excessive and exaggerated degree" because the Defendant had numerous opportunities to reflect on her actions but continued in her conduct, and the

Defendant destroyed H.P's vehicle, which "significantly impaired the livelihood of [H.P.]." The trial court found that the nature of the offenses "outweigh[ed] all other factors favoring alternative sentence[s]." The trial court ordered the Defendant to serve her sentence of four and one-half years in the Department of Correction and suspended the remaining sentences to supervised probation. The Defendant timely appeals the trial court's sentencing decisions.

## II. Analysis

On appeal, the Defendant argues that the trial court abused its discretion by: (1) considering that the Defendant could have been charged with kidnapping, (2) ordering a sentence of four and one-half years in confinement for theft of property valued at $1,000 or more but less than $10,000, and (3) by ordering partially consecutive sentence alignment. The State contends that the trial court properly exercised its discretion in sentencing the Defendant.

*Standard of Review*

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after "a proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2015), Sentencing Comm'n Cmts. To facilitate meaningful appellate review of a felony sentence, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2015); *Bise*, 380 S.W.3d at 706.

In determining the proper sentence, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in ]Tennessee Code Annotated sections] 40-35-113 and [-]114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; [and ]

(7) Any statement the defendant made on the defendant's own behalf about sentencing[.]

*See* Tenn. Code Ann. § 40-35-210(b) (2015); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2015).

*Length of Sentence*

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2015).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2015); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left

to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

Here, the Defendant specifically argues that the trial court erred in deciding the length of her sentence for count one because the trial court improperly considered the Defendant's uncharged conduct under Tennessee Code Annotated section 40-35-114(3), which states that "[t]he offense involved more than one . . . victim." The Defendant notes that the trial court frequently referred to the Defendant's "kidnapping" of the minor victims throughout the sentencing hearing.

Initially, we note that the trial court considered the fact that the Defendant could have been charged with kidnapping in Tennessee with regards to the "previous history of criminal convictions or criminal behavior" factor, *see* Tennessee Code Annotated section 40-35-114(1), in addition to considering whether the Defendant's offenses involved more than one victim. However, the trial court explicitly stated that "it legally c[ould not] find the presence of more than one victim here given the nature of the charge[]"; thus, we will only determine whether the trial court erred by considering the Defendant's conduct of kidnapping under the "previous history of criminal convictions or criminal behavior" enhancement factor.

The trial court may "look behind the plea bargain and consider the true nature of the offenses committed." *State v. Hollingsworth*, 647 S.W.2d 937, 939 (Tenn. 1983) (citing *State v. Welch*, 565 S.W.2d 492 (Tenn. 1978)); *see also State v. Pierce*, 138 S.W.3d 820, 828 (Tenn. 2004). In other words, "a trial court is not restricted to considering only the crime to which the defendant pled guilty, but may consider what the evidence shows actually happened." *State v. Jennifer Ann Hargrove and Thomas David Gambrell*, No. M2005-00300-CCA-R3-CD, 2006 WL 1896353, at *19 (Tenn. Crim. App. July 7, 2006), *no perm. app. filed*. Our court has previously affirmed trial courts' decisions to "look behind the plea bargain" at the facts of the case, including a defendant's uncharged criminal conduct. *See, e.g., State v. Lane*, 3 S.W.3d 456, 462 (Tenn. 1999) (affirming the denial of an alternative sentence in part because the defendant's criminal record indicated "two uncharged incidents of statutory rape and four uncharged incidents of official misconduct emanating from the relationship with [the victim]"); *State v. Jarrod Reese Spicer,* No. W2014-01817-CCA-R3-CD, 2015 WL

5173969, at *10 (Tenn. Crim. App. Aug. 31, 2015), *perm. app. denied* (Tenn. Jan. 14, 2016) (affirming sentence where the trial court considered "uncharged conduct that was revealed during the trial"); *State v. Christopher Wheeler*, No. M2011-01657-CCA-R3-CD, 2012 WL 4470673, at *3, 6 (Tenn. Crim. App. Sept. 27, 2012), *no perm. app. filed* (affirming sentence where the trial court considered uncharged conduct in applying Tenn. Code Ann. § 40-35-114(1)); *State v. Mason Thomas Wilbanks and Steve A. Williams*, No. 01C01-9804-CR-00184, 1999 WL 325958, at *8–9 (Tenn. Crim. App. May 21, 1999) (affirming, after a de novo review, the trial court's imposition of confinement based partly on "evidence of uncharged criminal activity"), *no perm. app. filed*. Thus, we conclude that the trial court did not err by considering or referring to the Defendant's criminal conduct as a "kidnapping" throughout the sentencing hearing.

The Defendant also argues that the trial court erred in not sentencing the Defendant to the minimum possible sentence for count 1, theft of property valued at $10,000 or more but less than $60,000. She argues that the State presented "the least amount of proof" regarding this conviction at the sentencing hearing, but the trial court ordered "the harshest sentence." However, the trial court's sentence for the Defendant's conviction of theft of property valued at $10,000 or more but less than $60,000 is entitled to a presumption of reasonableness because the trial court ordered a sentence within the appropriate range; a Range I Standard offender convicted of theft of property valued at $10,000 or more but less than $60,000 may receive a sentence of three to six years. *See* Tenn. Code Ann. § 39-14-105(a)(4) (2015) (theft of property is a Class C felony if the value of the property is between $10,000 and $60,000); *see also* Tenn. Code Ann. § 40-35-112(a)(3) (2015) (a Range I sentence for a Class C felony is three to six years). Additionally, the trial court's sentences for counts two, three, and four are entitled to a presumption of reasonableness because they are within the appropriate range. A Range I Standard offender conviction of theft of property valued at $1,000 or more but less than $10,000 may receive a sentence of two to four years. *See* Tenn. Code Ann. § 39-14-105(a)(3) (2015) (theft of property is a Class D felony if the value of the property is between $1,000 and $10,000); *see also* Tenn. Code Ann. § 40-35-112(a)(4) (2015) (a Range I sentence for a Class D felony is two to four years). A Range I Standard offender convicted of reckless endangerment may be sentenced to one to two years. *See* Tenn. Code Ann. § 39-13-103(b)(2) (2015) (reckless endangerment committed with a deadly weapon is a Class E felony); *see also* Tenn. Code Ann. § 40-35-112(a)(5) (2015) (a Range I sentence for a Class E felony is one to two years). Lastly, a Range I standard offender convicted of misdemeanor escape may receive a sentence up to eleven months and twenty-nine days. *See* Tenn. Code Ann. § 39-16-605(b)(1), (c)(2) (2015) (a person who knowingly escapes the lawful custody of a law enforcement officer is guilty of a Class A misdemeanor); *see also* Tenn. Code Ann. § 40-35-111(e)(1) (2015).

While the Defendant argues that the trial court should have ordered a lesser sentence because the trial court found that more mitigating factors applied to this conviction than enhancement factors, "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. The trial court did not abuse its discretion by ordering the Defendant to serve a sentence of four and one-half years for her conviction for theft of property valued at $10,000 or more but less than $60,000. The Defendant is not entitled to relief on this ground.

*Manner of Service*

The abuse of discretion with a presumption of reasonableness standard of review set by our supreme court in *Bise* also applies to a trial court's decision to grant or deny probation. *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012) (citing *Bise*, 380 S.W. 3d at 708). Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6)(A) (2015).

Tennessee Code Annotated section 40-35-303 states, in pertinent part, that "[a] defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less[.]" Tenn. Code Ann. § 40-35-303(a) (2015). A defendant has the burden of establishing that he is suitable for probation and "demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). When considering whether to order full probation, the trial court may consider "the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996) (citing Tenn. Code Ann. §§ 40-35-210(b)(4), -103(5), -103(1)(B) (1990)).

If a trial court denies probation, under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (A)–(C) (2015).

Here, the trial court ordered the Defendant to serve her four and one-half year sentence for theft of property valued at $10,000 or more but less than $60,000 in confinement because: (1) the Defendant exhibited a lack of potential for rehabilitation; (2) measures less than confinement had previously been unsuccessfully applied to the Defendant; (3) the Defendant had a "long substantial history" of criminal behavior and a "significant criminal record[]"; and (4) the offenses were "horrendous" and "of an excessive and exaggerated degree" and thus the nature of the offenses "outweigh[ed] all other factors favoring alternative sentence[s]." Regarding the circumstances and nature of the offenses, the trial court noted that the Defendant could have been charged with kidnapping the minor victims and that the Defendant testified that she knew the minor victims were in the vehicle when she backed out of the driveway but did not stop her conduct.

The Defendant argues that "[t]here [wa]s no sufficient basis articulated by the [t]rial [c]ourt for denying alternative sentencing on count one" because the trial court improperly focused on the nature of the offenses and that the Defendant "stole a vehicle that had children inside of it." The Defendant notes that the theft of H.P.'s vehicle, which involved the minor victims, was charged in count two of the indictment. However, the trial court ordered the Defendant's sentence for count one to be served in confinement, not the sentence for count two. Therefore, the Defendant argues that the trial court erred in ordering confinement for count one, theft of property valued at $10,000 or more but less than $60,000. However, we note that, when the trial court discussed the nature and circumstances of the offenses, it noted that the offenses were "essentially one continuing course of conduct[,]" and we find no error in the trial court's consideration of the nature and circumstances of the offenses as a whole. Additionally, as stated above, the trial court relied on four different reasons for its order of confinement on count one. Upon review, the record supports the trial court's consideration of the Defendant's criminal record and history of criminal behavior, as well as the Defendant's lack of potential for

rehabilitation and the fact that she was on probation when she committed the current offenses. The Defendant is not entitled to relief on this ground.

## Consecutive Sentencing

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that[] . . . [t]he defendant is an offender whose record of criminal activity is extensive[.]" Tenn. Code Ann. § 40-35-115(b)(2) (2015). This factor has been interpreted "to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court." *State v. Palmer*, 10 S.W.3d 638, 648 (Tenn. Crim. App. 1999). Additionally, "an extensive record of criminal activity may include criminal behavior which does not result in a conviction." *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006) (quoting *State v. William L. Vaughn*, No. M2002-01879-CCA-R3-CD, 2003 WL 21877929, *5 (Tenn. Crim. App. Aug. 1, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003)). Any one ground set out in the above statute is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

In this case, the trial court ordered partial consecutive sentencing because "the preponderance of the evidence establishe[d] that the [D]efendant [wa]s an offender whose record of criminal activity, including the juvenile record . . . [wa]s extensive." *See* Tenn. Code Ann. § 40-35-115(b)(2). The Defendant argues that the trial court erred in ordering partially consecutive sentences based solely on her criminal record because her criminal record is not extensive, and she has never been convicted of a violent offense.

We find no error in the trial court's ordering Count 2 to be served consecutively to Count 1. While the Defendant has not previously been convicted of a violent felony, the evidence does not preponderate against the trial court's finding that the Defendant's history of criminal activity, whether her admitted use of marijuana, methamphetamine, and opioids, or her prior convictions, was extensive. In addition to prior criminal convictions, an extensive record of criminal activity may include criminal behavior which does not result in a conviction. *See State v. Percy Wade Cockrill*, No. M2002-00761-CCA-R3-CD, 2003 WL 1787287, at *4 (Tenn. Crim. App. Apr. 4, 2003) (defendant's admission to the use of illegal drugs considered as part of defendant's extensive record of criminal activity), *perm. app. denied* (Tenn. Aug. 12, 2003). In any event, the trial court

previously recognized that the Defendant committed the current offenses while on probation; this ground also supported the trial court's order of partially consecutive sentences. The Defendant is not entitled to relief on this ground.

However, we note that the trial court ordered the sentence for misdemeanor escape to run consecutively to count one but concurrently to counts two and three. We remand for correction of the judgment sheets to reflect that the sentence for count four, escape, must be served consecutively to the sentences for counts two and three. *See* Tenn. Code Ann. § 39-16-605(d) (2015) ("Any sentence received for a violation of this section shall be ordered to be served consecutively to the sentence being served or sentence received for the charge for which the person was being held at the time of the escape[]"); *see also State v. Toney Jason Hale*, No. M2004-01370-CCA-R3-CD, 2005 WL 1812825, at *2 (Tenn. Crim. App. Aug. 2, 2005) ("the defendant's sentence for his felony escape conviction must be served consecutively to the sentences received for the charges for which the defendant was being held at the time he escaped[]"), *no perm. app. filed*.

## III. Conclusion

Based on the aforementioned reasons, we affirm the judgments of the trial court but remand for entry of corrected judgment sheets for counts two and three.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 16 -