IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs July 24, 2018, at Knoxville

**STATE OF TENNESSEE v. ROBERT L. SMITH**

**Appeal from the Circuit Court for Bedford County**
**No. 18093, 18094     Franklin L. Russell, Judge**

_____

**No. M2017-01569-CCA-R3-CD**

_____

Defendant, Robert L. Smith, was convicted of two counts of reckless aggravated assault in case number 18093 and of failure to appear in case number 18094 and received a total effective sentence of thirteen years with release eligibility after service of thirty-five percent of the sentence. On appeal, Defendant argues that the evidence is insufficient for a rational juror to have found him guilty of two counts of reckless aggravated assault and that his sentence is excessive. After a thorough review of the facts and applicable case law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Donna Orr Hargrove, District Public Defender; Michael J. Collins, Assistant District Public Defender (on appeal); and John H. Norton, III, Shelbyville, Tennessee (at trial) for the appellant, Robert L. Smith.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

The Bedford County Grand Jury indicted Defendant for two counts of reckless aggravated assault in case number 18093. After Defendant failed to appear in court for

case number 18093, the Bedford County Grand Jury indicted Defendant for felony failure to appear in case number 18094. On April 21, 2016, Defendant was convicted of failure to appear after a bench trial.[1]

### *Jury trial in case number 18093*

Wanda Overcast testified that, on June 6, 2014, she worked at the Hardees restaurant in Shelbyville. That afternoon, Ms. Overcast's mother, Bertha Prouty, picked her up from the restaurant to take her home. Ms. Prouty exited the Hardees parking lot, turned right onto Madison Street, and moved into the left-hand lane. Ms. Overcast testified that, when she and Ms. Prouty pulled onto Madison Street, there were no oncoming vehicles. Ms. Prouty continued in the left-hand lane until she came to the intersection at Deery Street and stopped at the red light. Ms. Prouty turned on her left turn signal, and after a minute, the light turned green. However, Ms. Prouty was unable to turn left because of oncoming traffic. Suddenly, Ms. Overcast "felt a boom[,]" heard metal being crushed, and noticed that the vehicle was pushed forward. Ms. Overcast heard "another boom," and the vehicle was pushed again. Ms. Overcast realized that a tractor-trailer had hit their vehicle from the rear. In total, the tractor-trailer hit Ms. Prouty's vehicle three times and pushed the vehicle into the intersection. Ms. Overcast testified that the incident was "very scary." After the wreck, Ms. Prouty moved her vehicle into the right-hand lane to avoid being hit by the tractor-trailer again. However, the tractor-trailer did not move into the right-hand lane. Instead, the tractor-trailer continued driving down Madison Street. Ms. Overcast called 911 as Ms. Prouty followed the tractor-trailer. Eventually, the tractor-trailer pulled into a parking lot, and Ms. Prouty pulled into the parking lot of a nearby Sonic restaurant. Ms. Overcast stated that law enforcement officers were "right behind" the tractor-trailer.

Ms. Overcast stated that, when the wreck occurred, she was injured by her seatbelt when she was whiplashed in her seat. She went to the hospital approximately a week after the wreck and obtained a sling for her arm. Ms. Overcast was unable to perform her regular work at Hardees and had to be reassigned to light-duty tasks for approximately three weeks. She stated that she was in pain from the wreck for "a month or two." Ms. Prouty's vehicle sustained dents and scratches, and a "wing" on the trunk was torn off in the wreck.

Ms. Prouty testified similarly to Ms. Overcast regarding the wreck with the tractor-trailer. She also testified that she did not see the tractor-trailer when she turned right onto Madison Street. She stated that she thought the tractor-trailer was going to kill her during the wreck. Ms. Prouty stated that she "had no earthly idea" why the tractor-

---

[1] The transcript of the bench trial in case number 18094 was not included in the record on appeal.

trailer hit her vehicle. Ms. Prouty informed law enforcement that her neck hurt, but she decided to wait for treatment to see if the pain ended. Ms. Prouty called an ambulance the next day because her pain "got worse and worse[.]" She explained that the wreck gave her whiplash and pulled the muscles in her neck. She was treated by a physical therapist for almost two years. On cross-examination, Ms. Prouty stated that approximately twenty vehicles from oncoming traffic proceeded through the intersection after the light turned green and before the wreck.

Deputy Tracy Harvey testified that she was a deputy with the Bedford County Sheriff's Office ("BCSO") and a school resource officer. During the afternoon of June 6, 2014, Deputy Harvey was working patrol on Madison Street and heard a call from dispatch regarding a wreck involving a tractor-trailer and a vehicle at the intersection of Deery Street and Madison Street. She turned around and attempted to locate the vehicles involved in the wreck. Deputy Harvey observed a tractor-trailer that she believed was involved in the wreck. She was about to activate her lights when the tractor-trailer pulled into a parking lot. Deputy Harvey and a Shelbyville Police Department ("SPD") officer, Tory Moore, approached the parked tractor-trailer, and Deputy Harvey was able to get Defendant's attention as he walked away from the tractor-trailer. When Deputy Harvey told Defendant that she needed to speak with him about the wreck, Defendant informed her that he going to get something to eat, that he had been sitting in the parking lot for a while, and that he did not know anything about a wreck. Officer Moore walked towards the front of the tractor-trailer and observed paint matching the description of the other vehicle involved in the wreck. Defendant continued to deny that he was involved with the wreck. Deputy Harvey did not smell alcohol on Defendant's person. Later, Deputy Harvey spoke with Ms. Overcast and Ms. Prouty, who were "very distraught." Deputy Harvey observed that their vehicle had sustained "a lot of damage" from the wreck.

Officer Moore testified that he was not on shift as a patrolman for the SPD on June 6, 2014. He explained that he was returning a vehicle to the SPD that had received maintenance work. Officer Moore was driving the marked patrol vehicle when he heard on the radio about a wreck involving a tractor-trailer and a vehicle at the intersection of Deery Street and Madison Street. He then observed the tractor-trailer turn into the parking lot from Madison Street. Officer Moore pulled into the parking lot behind the tractor-trailer and observed Deputy Harvey pull into the parking lot. Officer Moore explained that, when he and Deputy Harvey inquired if Defendant had been involved in the wreck, Defendant denied any involvement and averred that he had been sitting in the parking lot for approximately fifteen minutes. Other officers soon arrived at the parking lot, and Officer Moore left the scene.

Officer Michael Taylor testified that he worked for the SPD as a traffic enforcement officer. On June 6, 2014, Officer Taylor responded to a call about a wreck

involving a tractor-trailer and a vehicle at the intersection of Deery Street and Madison Street. Dispatch informed Officer Taylor that Deputy Harvey and Officer Moore had observed the tractor-trailer pulling into a parking lot, so he also proceeded to the parking lot. Officer Taylor stated that Defendant denied any involvement in the wreck. Officer Taylor suspected that Defendant might have been under the influence of an illegal substance and asked Defendant to perform some field sobriety tests. He stated that Defendant did not perform well on the tests, but Officer Taylor decided not to arrest Defendant for driving under the influence. Officer Taylor observed the front of the tractor-trailer and noticed that paint had transferred from Ms. Prouty's vehicle onto the tractor-trailer.

Officer Taylor approached Ms. Prouty and Ms. Overstreet to determine if they needed medical attention. He stated that they seemed "[t]errified" and "[e]xtremely shaken up." Officer Taylor also observed "extensive damage" on Ms. Prouty's vehicle. He stated that either Ms. Prouty or Ms. Overstreet was experiencing neck pain, so he called for an ambulance. Officer Taylor testified that Officer Daryl Birdsong advised Defendant of his *Miranda* rights. He also stated that Detective Sergeant Brian Cruz arrived at the parking lot and interviewed Defendant. Officer Taylor was present for a portion of the interview, and Defendant "admit[ted] to striking a vehicle." Defendant stated that he intentionally hit Ms. Prouty's vehicle because he was angry that Ms. Prouty had cut him off. Later, a blood sample was drawn from Defendant and sent to the Tennessee Bureau of Investigation ("TBI") laboratory. Defendant's blood sample tested negative for the presence of drugs or alcohol.

On cross-examination, Officer Taylor stated that Defendant seemed angry and agitated. Officer Taylor agreed that he continued investigating Defendant for DUI after Defendant performed poorly on the field sobriety tests.

Detective Sergeant Cruz testified that he did not normally investigate traffic accidents. However, when dispatch alerted law enforcement of the accident, dispatch described the accident as an "ongoing offense." Detective Sergeant Cruz noted that a passerby witnessed the accident and called 911, in addition to Ms. Overcast. He spoke with the shift supervisor at the scene, Sergeant James Wilkerson, and decided to proceed to the scene. Detective Sergeant Cruz learned that Defendant had been apprised of his *Miranda* rights and that Defendant "was a little animated and was angry toward the officers, which was out of character for someone, who . . . had just been involved in a minor accident." Detective Sergeant Cruz stated that, when he approached Defendant,

[h]e informed me just right off the bat, right out of the gate, that he had been in the parking lot five or ten minutes, he was making a phone call, and

- 4 -

after he finished his phone call, he was going to walk over to Captain D's and grab him a bite to eat.

Detective Sergeant Cruz knew that this statement was false because Officer Moore and Deputy Harvey had observed Defendant pull into the parking lot. Detective Sergeant Cruz responded,

["]Look, you're challenging me on information that I already know is . . . not true. I know that you just pulled into this parking lot, and that you were involved in something down the road. And it would be [in] your best interest to be honest with me about what took place. I don't know if you're having a bad day, if you woke up with a crick in your neck or what was going on, that started this day off on the wrong foot, but something bad has happened and now we need to try to fix what's happened. And the best way we can fix that is you be honest with me.["]

Defendant then admitted that Ms. Prouty and Ms. Overcast's vehicle pulled out in from of him and Ms. Prouty "began tapping the brakes," so Defendant hit Ms. Prouty's vehicle because he was upset. Defendant eventually admitted that he intentionally hit Ms. Prouty's vehicle three times. Detective Sergeant Cruz stated that Officer Bill Logue, a forensic investigator with the SPD, collected some of the transferred paint from the front of Defendant's tractor-trailer and Ms. Prouty's vehicle and submitted the samples to the TBI laboratory. Detective Sergeant Cruz testified that "the paint chips on the semi-truck were consistent with paint that came off of the samples that [Officer Logue] took from [Ms. Prouty's vehicle]." Detective Sam Jacobs obtained a surveillance video from Star Audio that depicted the accident, which was played for the jury.

On cross-examination, Detective Sergeant Cruz explained that, while Officer Taylor was the lead investigator of the accident, Detective Sergeant Cruz "was the investigator called to assist the patrol division, who ultimately arrested [Defendant] for the charges of aggravated assault." Detective Sergeant Cruz stated that the surveillance video from Audio Star confirmed witnesses' reports that Defendant repeatedly hit the rear of Ms. Prouty's vehicle. Detective Sergeant Cruz explained that he contacted the Tennessee Highway Patrol to help determine whether Defendant was under the influence of an illegal substance because "[t]here w[ere] significant concerns that [Defendant] may or may not have been under the influence of some type of narcotic."

After a *Momon* hearing, Defendant decided not to testify. The jury found Defendant guilty of two counts of reckless aggravated assault.

## *Sentencing Hearing*

At the October 6, 2016, sentencing hearing, the trial court admitted Defendant's presentence report into evidence. The trial court noted that Defendant had been convicted previously of attempted robbery in 1991 and gross sexual imposition in 1981 in Ohio. Defendant testified that, prior to the current offenses, he lived in Ohio and was self-employed as an over-the-road driver. Defendant admitted that, on June 6, 2014, he drove through Shelbyville to "avoid the scale out there on Interstate 24" because his log book was not in compliance. Defendant stated that he was remorseful for his actions underlying the current offenses. Defendant testified that, if he received an alternative sentence, he would live with his adult son in Ohio and continue working as an over-the-road driver. On cross-examination, Defendant stated that he had previously been audited by the Department of Transportation for failing to maintain his tractor-trailer and for failing to keep his log book in compliance. Defendant agreed that he currently had a vandalism charge pending in general sessions court in Bedford County. When the trial court questioned Defendant about his log book, Defendant stated that he "wasn't really paying attention [when he] struck the car." Defendant agreed that he initially informed law enforcement that he did not hit Ms. Prouty's vehicle. Defendant asserted that he took responsibility for the offenses when he viewed the surveillance video from Audio Star.

The trial court found that Defendant had two prior convictions from Ohio and found Defendant to be a Range II multiple offender. The trial court found that Defendant previously "failed to comply with the conditions of release into the community" because Defendant's parole was revoked in his attempted robbery conviction. The trial court found that no mitigating factors applied to Defendant's case. The trial court ordered Defendant to serve a five-year sentence for each of the reckless aggravated assault convictions and a three-year sentence for the failure to appear conviction with release eligibility after service of thirty-five percent of the sentence.

Regarding sentence alignment, the trial court found that Defendant had an extensive criminal record because Defendant "ha[d] five serious felony convictions[,]" including the three felony convictions of the current case. The trial court noted that two of the previous felonies were "extremely serious" and that the current offenses were "extremely serious." The trial court also found that Defendant "had low regard for human life" and had "no hesitation at all, where the risk to life was great." The trial court noted that Defendant "still ha[d]n't given [the trial court] a satisfactory explanation for why . . . he did what he did." Thus, the trial court ordered Defendant to serve his three sentences consecutively to each other, for a total effective sentence of thirteen years.

Regarding the manner of service of Defendant's sentence, the trial court "focused particularly on [Defendant's] potential or lack of potential for rehabilitation, including the

risk of committing another crime while on probation." The trial court found that there was a "very high probability" that Defendant would fail to abide by the conditions of an alternative sentence and would commit another offense. The trial court found that Defendant had "a serious criminal record" and that "confinement [wa]s necessary to protect society from someone with a long criminal history[.]" The trial court focused on the facts that Defendant had previously violated his parole and that he initially did not stop driving after he committed the current offenses. The trial court found that Defendant was not credible when Defendant asserted that he did not stop driving because his log book was not in compliance. The trial court concluded that Defendant was a "tremendous risk to the public" and ordered Defendant to serve his sentence in the Department of Correction.

Defendant's judgments of conviction were entered on October 6, 2016. He did not file a motion for a new trial or a notice of appeal. After Defendant filed a pro se petition for post-conviction relief, the trial court granted late-filed appeals in both cases on June 19, 2017. Defendant filed a motion for new trial on June 23, 2017. The trial court denied Defendant's untimely[2] motion for new trial on July 27, 2017, finding that "there was sufficient evidence to support the convictions" and that "the sentences were lawful and appropriate." Defendant filed a notice of appeal on August 7, 2017, which was also untimely.

However, a timely filed notice of appeal is not jurisdictional in this court, and we may elect to waive the requirement in the interest of justice. Tenn. R. App. P. 4(a). We will waive the timely filing of Defendant's notice of appeal in the interests of justice. We cannot waive the untimely filing of the motion for new trial and our review on appeal is limited to the sufficiency of evidence and sentencing issues.[3] *See State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997); *see also State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

---

[2] Because the trial court did not grant a new motion for new trial, Defendant's motion for new trial was filed more than thirty days after the judgments were entered and was therefore untimely. *See* Tenn. R. Crim. P. 33(b).

[3] Defendant only raised these issues on appeal.

## II. Analysis

### *Sufficiency of the evidence*

Defendant agrees that he "negligently caused an accident[,]" but he asserts his conduct does not meet the elements of the offense of reckless aggravated assault.[4] Defendant states that his vehicle "would have had a hard time slowing down after hitting Ms. Prouty's car" and thus, "[o]ne could reasonably expect it to hit the Nissan multiple times before coming back under control of the driver." The State contends that "the proof established that [D]efendant admitted intentionally hitting the victims[,]" and therefore, "the proof is sufficient to support the convictions."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-13-101 states that "[a] person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another[.]" Tenn. Code Ann. § 39-13-101(a)(1) (2014). Assault is aggravated when the assault "[i]nvolved the use or display of a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii) (2014). A deadly weapon includes "[a]nything that in the manner of its

---

[4] Defendant does not argue that the evidence was insufficient to support his conviction of felony failure to appear. Therefore, we will only address the sufficiency of the two convictions of reckless aggravated assault.

- 8 -

use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(B) (2014). The "reckless" mens rea refers to:

> a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (2014). Additionally, "[w]hen recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." Tenn. Code Ann. § 39-11-301(a)(2) (2014). This court has previously concluded that a motor vehicle can constitute a deadly weapon. *See State v. Tate*, 912 S.W.2d 785, 789 (Tenn. Crim. App. 1995); *see also State v. Thomas L. Cope*, No. M2014-00775-CCA-R3-CD, 2015 WL 4880347, at *6-7 (Tenn. Crim. App. Aug. 14, 2015) (concluding that the evidence was sufficient that the defendant had used his vehicle as a deadly weapon to sustain a conviction for reckless aggravated assault), *no perm. app. filed*.

The State notes that "the video conclusively showed that [D]efendant intentionally rammed the victims' small car with his tractor-trailer rig." The State also argues that Defendant "admitted to police that he intentionally hit the victims because he was angry, believing that they had cut him off in traffic." The surveillance video from Audio Start depicts Ms. Prouty's vehicle sitting in the left lane at the intersection for several seconds before Defendant's tractor-trailer approaches and hits Ms. Prouty's vehicle, pushing it into the intersection. Although Defendant initially informed Deputy Harvey and Officer Moore that he had been sitting in the parking lot for several minutes and was not involved in the accident, Defendant later told Detective Sergeant Cruz that he intentionally hit Ms. Prouty's vehicle because she had pulled out in front of him and then tapped her brakes. As a result of the accident, Ms. Prouty suffered whiplash and pulled the muscles in her neck. She was treated by a physical therapist for almost two years. Ms. Overcast was injured by her seatbelt when she was whiplashed in her seat. She went to the hospital approximately a week after the wreck and obtained a sling for her arm. Ms. Overcast was unable to perform her regular work at Hardees and had to be reassigned to light-duty tasks for approximately three weeks. She stated that she was in pain from the wreck for "a month or two." This evidence is sufficient for a rational juror to have found that Defendant caused bodily injury to Ms. Prouty and Ms. Overcast with the use of a deadly weapon, his tractor-trailer. Defendant's statement that he intentionally hit Ms. Prouty's

vehicle is suffices to establish the reckless *mens rea*. *See* Tenn. Code Ann. § 39-11-301(a)(2) (2014). Defendant is not entitled to relief on this ground.

## Excessive sentence

Defendant asserts that that the "sentence of thirteen years was not appropriate under the facts as stated in the record." The State contends that the trial court properly sentenced Defendant to a total effective sentence of thirteen years in the Department of Correction.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2016); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2016).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2016); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2016), Sentencing Comm'n Cmts.

Here, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for Defendant's sentences. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will not reverse absent an abuse of discretion.

*Sentence length*

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2016).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2016); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The trial court found that Defendant previously "failed to comply with the conditions of release into the community" because Defendant's parole was revoked in his attempted robbery conviction. The trial court found that no mitigating factors applied to Defendant's case. The State argues that Defendant's admission that he had falsified his log book should constitute prior criminal behavior under Tennessee Code Annotated section 40-35-114(1). The trial court did not consider Defendant's prior criminal history

- 11 -

in setting the sentence lengths, but regardless, we conclude that the trial court properly considered the advisory enhancement and mitigating factors. It was within the discretion of the trial court to enhance Defendant's sentences based on his failure to comply with the conditions of his previous release on parole.

*Consecutive sentencing*

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). Any one ground set out in the above statute is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

"The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is an offender whose record of criminal activity is extensive[.]" Tenn. Code Ann. § 40-35-115(b)(2) (2016). This factor has been interpreted "to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court." *State v. Palmer*, 10 S.W.3d 638, 647-49 (Tenn. Crim. App. 1999).

Section 40-35-115 also states that a trial court may impose consecutive sentencing, including when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (2016); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the trial court found that Defendant had an extensive criminal record because Defendant "ha[d] five serious felony convictions." The trial court noted that two of the previous felonies were "extremely serious" and that the current offenses were "extremely serious." A trial court may consider the defendant's current offenses in

determining whether the defendant has an extensive record of criminal activity for purposes of consecutive sentencing. *See State v. Carolyn J. Nobles*, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing *State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)), *no perm. app. filed.* The trial court also found that Defendant "had low regard for human life" and had "no hesitation at all, where the risk to life was great." The trial court noted that Defendant "still ha[d]n't given [the trial court] a satisfactory explanation for why . . . he did what he did." However, the trial court did not specifically find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *See Wilkerson*, 905 S.W.2d at 939.

The trial court did not strictly comply with the requirements of *Wilkerson* in finding that Defendant was a dangerous offender. In any event, the trial court found that Defendant had an extensive record of criminal activity, which is supported by the record, and this ground alone supports the imposition of consecutive sentencing. *See Pollard*, 432 S.W.3d at 862; Tenn. Code Ann. § 40-35-115(b)(2) (2016). We conclude that the trial court properly exercised its discretion in ordering Defendant's sentences to be served consecutively to each other for a total effective sentence of thirteen years.

*Denial of probation*

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony[] should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6)(A) (2016). Defendant was sentenced as a multiple offender and therefore was not a favorable candidate for alternative sentencing.

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2016).

In the case *sub judice*, the trial court "focused particularly on [Defendant's] potential or lack of potential for rehabilitation, including the risk of committing another crime while on probation." The trial court found that there was a "very high probability" that Defendant would fail to abide by the conditions of an alternative sentence and would commit another offense. The trial court found that Defendant had "a serious criminal record" and that "confinement [wa]s necessary to protect society from someone with a long criminal history[.]"

The trial court's order of confinement is supported by the record. Defendant had a prior history of criminal offenses and had previously failed to successfully complete parole. We conclude that the trial court properly exercised its discretion by ordering Defendant to serve his sentence in the Department of Correction. Defendant's sentence is not excessive, and he is not entitled to relief on this ground.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the trial court's judgments.

_____
ROBERT L. HOLLOWAY, JR., JUDGE